**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| KATHY MOREHART, GLEN HARBIN, TOBY PARCELL, MELISSA ALVAREZ, COLLENA ALLEN, TONI MENDOSA, DAVID APPLEMAN, THEODORE BARTOLO, ALLI BRUNELL, JOBY CHILDRESS, MARSHAL DETHERAGE, JENNIFER GLODEK, AUTUMN ANDREWS, SERENA GOLD-PETERS, CHARLES LIGON, TASHA MATHIS, MICHAEL PLANTE, JASMINE WALKER, MARK WILLIAMS, MELISSA JANEIRO, AND MASON MALDONADO, *on behalf of themselves and all others similarly situated*,<br><br>        Plaintiffs,<br><br>v.<br><br>OPENLOOP HEALTH, INC.,<br><br>        Defendant. | Case No. 4:26-cv-00074-SHL-SBJ<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Kathy Morehart, Glen Harbin, Toby Parcell, Melissa Alvarez, Collena Allen, Toni Mendosa, David Appleman, Theodore Bartolo, Alli Brunell, Joby Childress, Marshal Detherage, Jennifer Glodek, Autumn Andrews, Serena Gold-Peters, Charles Ligon, Tasha Mathis, Michael Plante, Jasmine Walker, Mark Williams, Melissa Janeiro, and Mason Maldonado, individually and on behalf of all others similarly situated, by and through undersigned counsel, alleges, upon personal knowledge as to their own actions and experiences and, where indicated, upon information and good faith belief, against OpenLoop Health, Inc. ("OpenLoop" or "Defendant") the following.

**NATURE OF THE ACTION**

1.      Plaintiffs seek monetary damages and injunctive and declaratory relief arising from Defendant's failure to safeguard the Personally Identifiable Information ("PII")[1] and Protected Health Information ("PHI") of Plaintiffs and the proposed Class Members, as a result of a data breach.

2.      Defendant is a digital health infrastructure company headquartered in Des Moines, Iowa that provides white-label telehealth support services, including provider staffing, clinical operations, technology platforms, and practice management, to healthcare organizations, digital health companies, retailers, and employers nationwide.[2]

3.      As a third-party vendor for healthcare providers that encounters, stores, and maintains PHI, Defendant is covered under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and must comply with HIPAA's requirements regarding data security.

4.      As part of its operations, Defendant collects, maintains, and stores highly sensitive personal information belonging to individuals who receive care through Defendant's network of licensed clinicians and partner platforms, including PII and PHI, such as names, email addresses, phone numbers, home addresses, dates of birth, health insurance information, order information (such as IP addresses, financial information, medication information, and medication tracking information, and other metadata), and medical records (such as weight, height, medical

---

[1] The Federal Trade Commission ("FTC") defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendant, not every type of information included in that definition was compromised in the subject data breach.
[2] *See* https://openloophealth.com/ (last visited: May 7, 2026).

2

information, biometric data, prescription information, and additional PHI) (collectively, the "Sensitive Information").

5.      Plaintiffs and the Class Members are current or former patients of Defendant or Defendant's customers who provided Defendant with their Sensitive Information as a condition of receiving healthcare services.

6.      In or around January 2026, a threat actor operating under the alias "stuckin2019" posted on a cybercrime forum that it had successfully *exfiltrated* data from Defendant's systems, claiming to possess over 1.6 million records containing personal and medical information of customers of Defendant's partner platforms (the "Data Breach").[3] Stuckin2019 subsequently posted the stolen information for sale on the dark web. Upon information and belief, the stolen Sensitive Information is now in the hands of Stuckin2019 and other cybercriminals who intend to misuse the Sensitive Information.

7.      Despite the threat actor's public announcement of the breach and clear evidence that the data of Defendant's partners' customers was compromised, Defendant has failed to notify affected individuals, including Plaintiffs, leaving them unaware that their most sensitive personal and medical information is in the hands of cybercriminals.

8.      Upon information and belief, Plaintiffs' and Class Members' PHI and PII—which they entrusted to Defendant on the mutual understanding that Defendant would protect against disclosure—was targeted, compromised, and unlawfully accessed due to the Data Breach.

---

[3] Dark Web Informer (@DarkWebInformer), Post on X (formerly Twitter) (Jan. 2026), https://x.com/DarkWebInformer/status/2009284913506161002; *see also OpenLoop Health Data Breach Allegedly Exposes 1.6M Patient Records*, DataBreach.io (Jan. 8, 2026), https://databreach.io/breaches/openloop-health-data-breach-allegedly-exposes-1-6m-patient-records/.

9. Healthcare providers and digital health companies that handle Sensitive Information, such as Defendant, have an obligation to employ reasonable and necessary data security practices to protect the sensitive, confidential, and personal information entrusted to them.

10. This duty exists in federal and state statutory law and common law because it is foreseeable that the exposure of such Sensitive Information to unauthorized persons—and especially threat actors known to sell or publicly release stolen data—will result in harm to the affected individuals, including, but not limited to, medical and financial identity theft, invasion of their private health matters and other long-term issues.

11. The harm resulting from a data breach is particularly severe when, as here, the stolen information is particularly sensitive and the responsible parties fail to notify affected individuals, depriving them of the opportunity to take protective measures, and when cybercriminals publicly advertise possession of the stolen data.

12. Mitigating the risk from this breach requires individuals to devote significant time, money and other resources to closely monitor their credit, financial accounts, health records and email accounts, as well as to take a number of additional prophylactic measures—steps that are made more urgent by Defendant's failure to provide notification.

13. In this instance, all of that could have been avoided if Defendant had employed reasonable and appropriate data security measures and fulfilled its duty to promptly notify affected individuals.

14. Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to the Sensitive Information stored on its network to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in

transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and regularly changing passwords. These are all industry standard data security measures.

15. As a result of the Data Breach and Defendant's failure to notify, Plaintiffs and Class Members are, and continue to be, at significant risk of identity theft and various other forms of personal, social, medical and financial harm. The risk will remain for their respective lifetimes.

16. Armed with the Sensitive Information accessed in the Data Breach (and a significant head start), data thieves can commit a variety of crimes including: (i) opening new financial accounts in Class Members' names; (ii) taking out loans in Class Members' names; (iii) using Class Members' names to obtain medical services; (iv) using Class Members' information to obtain government benefits; (v) filing fraudulent tax returns using Class Members' information; (vi) obtaining driver's licenses in Class Members' names but with another person's photograph; and/or (vii) giving false information to police during an arrest.

17. Defendant's harmful conduct has injured Plaintiffs and Class Members in multiple ways, including: (i) publication of their Sensitive Information to the dark web; (ii) the lost or diminished value of their Sensitive Information; (iii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iv) lost opportunity costs to mitigate the Data Breach's consequences, including lost time; (v) invasion of their privacy; (vi) lost benefits of the bargain; and (vii) emotional distress associated with the loss of control over their highly confidential Sensitive Information.

18. Upon information and belief, Plaintiffs' Sensitive Information is available on the dark web as a result of the Data Breach.

19. As such, Plaintiffs and Class Members bring this action to recover for the harm they suffered and assert the following claims: (i) negligence, (ii) breach of implied contract, (iii) unjust

enrichment, (iv) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and (v) declaratory judgment.

## PARTIES

20.     Plaintiff Kathy Morehart is a natural person and citizen of Pennsylvania, where she intends to remain.

21.     Plaintiff Glen Harbin is a natural person and citizen of Ohio, where he intends to remain.

22.     Plaintiff Toby Parcell is a natural person and citizen of Kansas, where he intends to remain.

23.     Plaintiff Melissa Alvarez is a natural person and citizen of Texas, where she intends to remain.

24.     Collena Allen is a natural person and citizen of California, where she intends to remain.

25.     Toni Mendosa is a natural person and citizen of California, where she intends to remain.

26.     David Appleman is a natural person and citizen of California, where he intends to remain.

27.     Theodore Bartolo is a natural person and citizen of Georgia, where he intends to remain.

28.     Alli Brunell is a natural person and citizen of California, where she intends to remain.

29.     Joby Childress is a natural person and citizen of Texas, where he intends to remain.

30.     Marshal Detherage is a natural person and citizen of Tennessee, where he intends to remain.

31.     Jennifer Glodek is a natural person and citizen of Pennsylvania, where she intends to remain.

32.     Autumn Andrews is a natural person and citizen of Michigan, where she intends to remain.

33.     Serena Gold-Peters is a natural person and citizen of Texas, where she intends to remain.

34.     Charles Ligon is a natural person and citizen of Tennessee, where he intends to remain.

35.     Tasha Mathis is a natural person and citizen of Texas, where she intends to remain.

36.     Michael Plante is a natural person and citizen of Massachusetts, where he intends to remain.

37.     Jasmine Walker is a natural person and citizen of Maryland, where she intends to remain.

38.     Mark Williams is a natural person and citizen of California, where he intends to remain.

39.     Melissa Janeiro is a natural person and citizen of Texas, where she intends to remain.

40.     Mason Maldonado is a natural person and citizen of Texas, where he intends to remain.

41.     Defendant Openloop Health, Inc. is organized as a corporation under the laws of the State of Delaware and operates a digital health infrastructure business providing white-label

telehealth support services, including clinical staffing, technology platforms, and practice management to healthcare organizations nationwide, with its principal place of business located at 317 6th Ave #400, Des Moines, Iowa 50309.

## JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2) ("CAFA") because: (i) the proposed Class consists of more than 100 members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one member of the proposed Class is a citizen of a state different from that of Defendant.

43.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in Des Moines, Iowa, within this District, and regularly conducts business in this District.

44.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, including Defendant's collection, storage, and failure to secure the Sensitive Information at issue.

## COMMON FACTUAL ALLEGATIONS

**A.    Defendant Collects, Maintains, and Stores Sensitive Personal and Medical Information.**

45.     Defendant operates as a white-label telehealth infrastructure provider, powering virtual care services for numerous healthcare organizations and digital health companies. Through its network of U.S.-licensed clinicians, Defendant provides clinical services, including medical evaluations, prescription management, and treatment oversight, to individuals who access care through Defendant's partner platforms.

46.    In the course of providing telehealth services through its partner platforms, Defendant demands, requests, receives, maintains, and stores large volumes of sensitive personal health information and personally identifiable information from the individuals it serves.

47.    Specifically, to receive healthcare services facilitated by Defendant, individuals including Plaintiffs and the Class Members are required to provide their PHI and PII, including but not limited to full names, email addresses, phone numbers, home addresses, dates of birth, health insurance information, order information (such as IP addresses, financial information, medication information, and medication tracking information, and other metadata), and medical records (such as weight, height, medical information, biometric data, prescription information, and additional PHI).

48.    Defendant derives a substantial economic benefit from providing telehealth infrastructure and clinical services to individuals through its partner platforms, and as a part of providing those services, Defendant retains and stores Plaintiffs' and Class Members' Sensitive Information. Without the required submission of Sensitive Information, Defendant could not provide its services.

49.    By collecting and storing this information, Defendant assumes a duty to securely maintain and protect the PHI and PII of individuals whose data it collects and stores. This duty is imposed both under federal and state statutory law and common law. As such, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting the Sensitive Information from disclosure.

50.    The PHI and PII that Defendant maintains are highly sensitive and valuable, making them a particularly attractive target for cybercriminals seeking to obtain and misuse or sell the data of Defendant's partners' customers.

51.     Defendant made promises to Plaintiffs and Class Members to maintain and protect Plaintiffs' and Class Members' Sensitive Information, demonstrating an understanding of the importance of securing Sensitive Information.

52.     Defendant acknowledges through its privacy policies and communications with individuals and partner organizations its obligation to protect the information of individuals served through its partner platforms and comply with applicable privacy laws and regulations, including HIPAA.

53.     Specifically, Defendant's Privacy Policy states:

We are required by law to maintain the privacy and security of your protected health information. • We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information.

We must follow the duties and privacy practices described in this notice and give you a copy of it. • We will not use or share your information other than as described here unless you tell us we can in writing.[4]

54.     Plaintiffs and Class Members relied on Defendant to implement and maintain reasonable and adequate security measures to keep their PHI and PII secure and protected from unauthorized access.

55.     Moreover, Defendant was prohibited by the FTCA (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce."

56.     A company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

57.     Defendant is further required by various states' laws and regulations to protect Plaintiffs' and Class Members' Sensitive Information.

---

[4]     OpenLoop, *OpenLoop Notice of Privacy Practices* (Sept. 15, 2025) https://openloophealth.com/notice-of-privacy-practices. (Emphasis in original).

58. Defendant had obligations under the FTC Act, HIPAA, contract, industry standards, and representations made to Plaintiffs and Class members, to keep their Sensitive Information confidential and to protect it from unauthorized access and disclosure.

59. Defendant owed a duty to Plaintiffs and Class Members to design, maintain, and test its computer and application systems to ensure the Sensitive Information in its possession was adequately secured and protected.

60. Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Sensitive Information in its possession, including adequately training its employees (and others who accessed Sensitive Information within its computer systems) on how to adequately protect Sensitive Information.

61. Defendant owed a duty to Plaintiffs and Class Members to implement processes that would detect a breach on its systems in a timely manner.

62. Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

63. Defendant owed a duty to Plaintiffs and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Sensitive Information from theft because such an inadequacy would be a material fact in the decision to entrust Sensitive Information to Defendant.

64. Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when data breaches occurred.

65. Defendant owed a duty of care to Plaintiffs and Class Members because it was a foreseeable victim of a data breach.

11

66. Despite these duties and express promises to keep Plaintiffs' and the Class Members' Sensitive Information confidential, Defendant failed to implement and maintain reasonable and necessary cybersecurity measures in line with industry standards. Rather, Defendant chose to store Plaintiffs' and the Class Members' most sensitive information on a vulnerable Internet accessible network.

**B.     The Data Breach.**

67. Due to Defendant's failure to implement and maintain reasonable and necessary data security, cybercriminals were able to gain unauthorized access to Defendant's vulnerable security system and ***steal*** the Sensitive Information stored thereon, which included Plaintiffs' and Class Members' Sensitive Information.

68. On or around January 7, 2026, a threat actor using the alias "stuckin2019" announced on a cybercrime forum that it had successfully exfiltrated data from Defendant's systems, claiming to possess records of more than 1,600,000 individuals who received services through Defendant's partner platforms in the United States.[5]

69. Stuckin2019 listed the stolen patient data from OpenLoop Health for sale on the popular hacking forum, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

70. According to the forum posting and cybersecurity researchers who reviewed the listing, the compromised data includes personal identifiers such as full names, email addresses, phone numbers, physical addresses, and dates of birth, as well as IP addresses, prescription-related

---

[5] Dark Web Informer (@DarkWebInformer), Post on X (formerly Twitter) (Jan. 2026), https://x.com/DarkWebInformer/status/2009284913506161002; *see also OpenLoop Health Data Breach Allegedly Exposes 1.6M Patient Records*, DataBreach.io (Jan. 8, 2026), https://databreach.io/breaches/openloop-health-data-breach-allegedly-exposes-1-6m-patient-records/.

information, delivery tracking details, and medical attributes such as body measurements and other health indicators. Multiple data samples were shared by the seller, indicating unauthorized access to non-public medical records rather than publicly available information.

71.    It was no until March 17, 2026 that Defendant began to issue notice to affected individuals, staing only that:

> [OpenLoop] learned that an unauthorized third party had gained access to certain OpenLoop systems and removed certain information. Upon discovery, OpenLoop launched an investigation with the assistance of external cybersecurity specialists and in coordination with federal law enforcement, to determine the nature and scope of the incident and to confirm that the unauthorized access had been terminated. Through this investigation, OpenLoop determined that the unauthorized access occurred from January 7 to January 8, 2026. OpenLoop has taken steps designed to prevent something like this from happening again, including deploying additional threat detection and response tools.[6]

72.    As of the date of this filing, Plaintiffs and Class Members have yet to been informed of the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again.

73.    The Identity Theft Research Center's 2024 Annual Data Breach Report notes that, "approximately 70 percent of cyberattack-related breach notices did not include attack information, compared to 58 percent in 2023. In 2019 and previous years, ~100 percent of breach notices included attack vector information." Eva Velasquez, CEO of the Identity Theft Resource Center, remarked that "[w]ith a near-record number of compromises and over 1.3 billion victim notices, often tied to inadequate cyber practices, we are also seeing an increase in notices that provide limited actionable information for victims."[7]

---

[6] OpenLoop Health, *OpenLoop Data Security Incident* (Mar. 17, 2026), PR Newswire, https://www.prnewswire.com/news-releases/openloop-data-security-incident-302722420.html
[7] Identity Theft Resource Center, *2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices*, ITRC (Jan. 28, 2025), available at https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/

74. Defendant's "disclosure" of the Data Breach, amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts.

75. Despite Defendant's intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice, including (a) this Data Breach was the work of cybercriminals (b) that the cybercriminals first infiltrated Defendant's networks and systems, and downloaded data from the networks and systems (aka exfiltrated data, or in layperson's terms "stole" data; and (c) once inside Defendant's networks and systems, the cybercriminals targeted Plaintiffs' and Class Members' Sensitive Information for download and theft.

76. Defendant could have and should have prevented this Data Breach or minimized the impact of the Data Breach by properly securing and encrypting the files and file servers containing the Sensitive Information of Plaintiffs and Class Members.

77. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiffs and Class Members, causing the exposure of Sensitive Information, such as encrypting the information or deleting it when it is no longer needed.

78. Upon information and belief, as a result, criminal actors accessed and stole files containing unencrypted Sensitive Information of Plaintiffs and Class Members and posted the information for sale on the dark web.

**C.    Defendant Knew or Should Have Known of the Risk of Storing Sensitive Information & Potential Harm to Victims.**

79. Defendant was well aware that the Sensitive Information it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

14

80.     Defendant also knew that a breach of its systems—and exposure of the information stored therein—would result in the increased risk of identity theft and fraud (financial and medical) against the individuals whose Sensitive Information was compromised, as well as intrusion into their highly private health information.

81.     These risks are not merely theoretical; in recent years, numerous high-profile data breaches have occurred at businesses such as Equifax, Facebook, Yahoo, Marriott, Anthem as well as countless ones in the healthcare industry.

82.     PII has considerable value and constitutes an enticing and well-known target to hackers, who can easily sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[8]

83.     PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.[9]

84.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. Data breaches have been on the rise for several years. In 2023 there were 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1,400 percentage points. "In 2024, healthcare data breaches reached an all-time high, with 276,775,457 records compromised – a

---

[8] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.
[9] *See* Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

64.1% increase from the previous year's record and equivalent to 81.38% of the United States population."[10]

85.    The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[11]

86.    Additionally, healthcare providers "store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it quickly – making the industry a growing target."[12]

87.    Indeed, cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[13]

88.    The breadth of data that was, upon information and belief, compromised in the Data Breach makes the information particularly valuable to thieves and leaves individuals whose data Defendant stored especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud and more.

89.    In light of recent high profile data breaches at other healthcare organizations, including Yale New Haven Health (5.5 million records, April 2025), Episource, LLC (5.4 million

---

[10] Cybernews, *US Hospitals and Health Systems Data Breach* (Apr. 8, 2025), available at https://cybernews.com/security/us-hospitals-and-health-systems-data-breach/

[11] *The Healthcare Industry is at Risk*, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/.
[12] *Id.*
[13] *2022 Breach Barometer*, https://www.protenus.com/breach-barometer-report.

records, June 2025), Blue Shield of California (4.7 million records, May 2025), Frederick Health Medical Group (934,326 records, February 2025), University of Pittsburgh Medical Center (712,000 records, March 2025), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

90.     As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "[m]edical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[14]

91.     A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market whereas stolen payment card information sells for about $1.[15]

92.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired

---

[14] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[15] *Managing Cyber Risks in an Interconnected World, Key Findings from The Global State of Information Security Survey 2015*, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

93.    In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

94.    Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Sensitive Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

95.    For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for seven years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[16] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

---

[16] *See* Federal Trade Commission, *Steps*, IdentityTheft.gov, https://www.identitytheft.gov/Steps (last visited Apr. 26, 2026).

96.     Identity thieves can also use stolen personal information for a variety of crimes, including medical identity theft, credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information.

97.     There may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused.

98.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[17]

99.     Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

100.    Based on the value of the PII and PHI it stored to cybercriminals, Defendant certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

---

[17] *Report to Congressional Requesters, Personal Information* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

**D.      The Data Breach Was Preventable.**

101.    Data breaches are preventable.[18] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[19] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[20]

102.    Given that Defendant was storing the Sensitive Information of Plaintiffs and Class Members and knew or should have known of the serious risk and harm caused by a data breach, Defendant was obligated to implement reasonable measures to prevent and detect cyber-attacks, such as those recommended by the FTC, required by HIPAA, and promoted by data security experts and other agencies.

103.    That obligation stems from the foreseeable risk of a data breach given that Defendant collected, stored, and had access to a swath of highly sensitive medical records and personal data and, additionally, because other highly publicized data breaches at numerous healthcare institutions and telehealth companies put Defendant on notice that the personal and sensitive data it stores might be targeted by cybercriminals.

104.    Indeed, cyberattacks on medical systems and healthcare companies like Defendant have become so notorious that the Federal Bureau of Investigation and United States Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a

---

[18] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[19]*Id.* at 17.
[20]*Id.* at 28.

potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[21]

105.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in recent years.[22]

106.    Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and therefore to anyone in Defendant's industry, including Defendant.

107.    To prevent To prevent and detect cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege:

---

[21] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomeware.
[22] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

● Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

● Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

● Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

● Consider disabling Remote Desktop protocol (RDP) if it is not being used.

● Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

● Execute operating system environments or specific programs in a virtualized environment.

● Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[23]

108.    Defendant failed to properly implement such basic data security practices.

109.    To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-    Apply latest security updates
-    Use threat and vulnerability management
-    Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

---

[23] *Id.* at 3-4.

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[24]

110.    Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry and the prevalence of healthcare data breaches, Defendant inexplicably failed to adopt sufficient data security process by, without limitation:

a.    Failing to properly select its information security partners;

b.    Failing to ensure the proper monitoring and logging of the ingress and egress of network traffic;

c.    Failing to ensure the proper monitoring and logging of file access and modifications;

---

[24] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited May 7, 2026).

d. Failing to ensure the proper training of its technology partners' employees as to cybersecurity best practices;

e. Failing to ensure fair, reasonable, or adequate computer systems and data security practices to safeguard the PII and PHI of Plaintiffs and Class Members;

f. Knowingly disregarding standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII and PHI; and

g. Failing to provide adequate supervision and oversight of the PII and PHI with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PII and PHI of Plaintiffs and Class Members, misuse the PHI/PII and potentially disclose it to others without consent.

111. Upon information and belief, Defendant further failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data security incidents, to ensure the proper encryption of Plaintiffs' and Class Members' Sensitive Information, and to monitor user behavior and activity to identify possible threats.

112. Time is of the essence when highly sensitive PII and PHI is subject to unauthorized access and/or acquisition.

113. Plaintiffs and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the unauthorized access of their PHI and PII.

114. Plaintiffs and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing sensitive personal information.

115. Despite the highly sensitive nature of the information that Defendant obtained, maintained, and stored and the prevalence of healthcare data breaches, Defendant inexplicably failed to take appropriate steps to safeguard the Sensitive Information of Plaintiffs and Class Members from being compromised.

24

116.    The Data Breach itself, and information Defendant has disclosed about the breach to date, demonstrate Defendant failed to implement reasonable measures to prevent cyber-attacks and exposure of the Sensitive Information it oversaw.

**E.    Defendant Failed to Comply with FTC Guidelines.**

117.    The FTC recognizes that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[25]

118.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

119.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for business.

120.    Those guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[26]

121.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords

---

[25] Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), https://www.ftc.gov/news-events/news/speeches/remarks-ftc-exploring-privacy-roundtable.
[26] *Protecting Personal Information: A Guide for Business* (2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[27]

122.    The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business.

123.    According to the FTC, reasonable data security protocols require:

   a.   Encrypting the information stored on computer networks;

   b.   Retaining payment card information only as long as necessary;

   c.   Properly disposing of personal information that is no longer needed or can be disposed pursuant to relevant state and federal laws;

   d.   Limiting administrative access to business systems;

   e.   Using industry-tested methods for security;

   f.   Monitoring activity on networks to uncover unapproved activity;

   g.   Verifying that privacy and security features function properly;

   h.   Testing for common vulnerabilities; and

   i.   Updating and patching third-party software.[28]

124.    The FTC cautions businesses that failure to protect Sensitive Information and the resulting data breaches can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the effect.[29] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures—like Defendant failed to do here—as an unfair act prohibited by Section 5(a) of the FTC Act.

---

[27]    *Start with Security: A Guide for Business* (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[28] *Id.*
[29] *See Taking Charge, What to Do if Your Identity is Stolen*, at 3 (Jan. 2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen.

125.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

126.    Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

127.    These FTC enforcement actions include actions against healthcare providers and partners like Defendant.

128.    Defendant failed to implement and maintain reasonable and appropriate measures as directed by the FTC.

129.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customer's Sensitive Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

130.    On information and good faith belief Plaintiffs allege that Defendant was at all times fully aware of the obligation to protect the Sensitive Information of individuals whose data it collected and stored. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F.      Defendant Failed to Comply with Industry Standards.**

131.    As shown above, experts studying cybersecurity routinely identify healthcare providers and digital health companies as being particularly vulnerable to cyberattacks because of the value of the Sensitive Information which they collect and maintain.

132. Several best practices have been identified that at a minimum should be implemented by healthcare providers and digital health infrastructure companies like Defendant, including but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

133. The United States Government and the United States Cybersecurity & Infrastructure Agency recommend several similar and supplemental measures to prevent and detect cyberattacks, including, but not limited to: implement an awareness and training program, enabling strong spam filters, scanning incoming and outgoing emails, configuring firewalls, automating anti-virus and anti-malware programs, managing privileged accounts, configuring access controls, disabling remote desktop protocol, and updating and patching computers.

134. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

135. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical

Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

136. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

**G.     Defendant's Conduct and Insufficient Data Security Violate HIPAA.**

137. The Health Insurance Portability and Accountability Act of 1996 requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

138. Covered entities must implement safeguards to ensure the confidentiality and availability of PII and PHI. Safeguards must include physical, technical, and administrative components.[30]

139. Title II of HIPAA contains what are known as the Administrative Simplification provisions.[31] These provisions require, among other things, that the Department of Health and Human Services ("HHS") creates rules to streamline the standards for handling PII and PHI, like the data Defendant left unguarded.

140. HHS subsequently promulgated multiple regulations under the authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. §164.306(a)(1)-(4); 45 C.F.R. §164.308(1)(i); 45 C.F.R. §164.308(a)(1)(ii)(D), and 45 C.F.R. §164.530(b).

---

[30] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).
[31] 42 U.S.C. § 1301, *et seq.*

141.    A data breach, such as the one Defendant experienced, is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule. A breach under the HIPAA Rules is defined as, "the acquisition, access, use, or disclosure of PHI in a manner not permitted under [the HIPAA Privacy Rule] which compromises the privacy of the PHI."[32]

142.    The Data Breach resulted from a combination of insufficiencies that Defendant failed to comply with safeguards maintained by HIPAA regulations.

143.    Furthermore, persons, including healthcare providers and their business associates, that receive information from a confidential communication or record, as described above, "may not disclose the information except to the extent that disclosure is consistent with the authorized purposes for which the information was first obtained."[33]

144.    Defendant's Data Breach and unauthorized disclosure of Plaintiffs' and Class Members' Sensitive Information to malicious third parties violated Plaintiffs' and Class Members' rights to privacy and confidentiality in their receipt of healthcare services and fell below the applicable standards for safeguarding the confidential Sensitive Information of Plaintiffs and Class Members.

**H.    The Data Breach Resulted from Defendant's Failure to Properly Maintain and Safeguard Its Systems and Data**

145.    Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data.

---

[32] *See* C.F.R. § 164.40.
[33] *Id.* § 159.002(c).

146. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect Plaintiffs' and Class Members' Sensitive Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that its vendors with access to its computer systems employed reasonable security procedures;

e. Failing to detect unauthorized ingress into its systems;

f. Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;

g. Failing to detect unauthorized exfiltration of the most sensitive data on its system;

h. Failing to train its employees in the proper handling of emails containing Sensitive Information and maintain adequate email security practices;

i. Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. §164.306(a)(1);

j. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

k. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1)(i);

l. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. §164.308(a)(1)(ii)(D);

m. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

n. Failing to ensure compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. §164.306(a)(4);

o.  Failing to train all members of its workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out its functions and to maintain security of PHI, in violation of 45 C.F.R. §164.530(b);

p.  Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key"[34];

q.  Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act, and

r.  Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' Sensitive Information.

147.  Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Sensitive Information. Accordingly, as outlined below, Plaintiffs and Class Members now face actual fraud and identity theft as well as increased risk of fraud and identity theft. In addition, Plaintiffs and Class Members lost the benefit of the bargain they made with Defendant.

## I.  Plaintiffs' Individual Experiences.

### *Plaintiff Kathy Morehart*

148.  Plaintiff Kathy Morehart is an adult individual and a natural person residing in Williamsport, Pennsylvania, where she intends to stay.

149.  On or around March 17, 2026, Plaintiff Morehart received a Notice of Data Incident letter from Defendant informing her that her Sensitive Information was stolen in the Data Breach.

150.  As a condition of being a patient/member of a medical organization that utilizes Defendant's services, Plaintiff Morehart provided her Sensitive Information to Defendant with the reasonable expectation that Defendant would take reasonable precautions to protect her confidential Sensitive Information.

---

[34] 45 C.F.R. §164.304.

151.    Plaintiff Morehart is a reasonably cautious person and is therefore careful about sharing her Sensitive Information. As a result, she has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source. Plaintiff stores any documents containing her Sensitive Information in a safe and secure location or destroys the documents. Moreover, Plaintiff Morehart diligently chooses unique usernames and passwords for her various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

152.    Plaintiff Morehart only allowed Defendant to maintain, store, and use her Sensitive Information because she believed that Defendant would use basic security measures to protect her Sensitive Information, such as requiring passwords and multi-factor authentication to access databases storing her Sensitive Information. As a result, Plaintiff Morehart's Sensitive Information was within the possession and control of Defendant at the time of the Data Breach.

153.    In the instant that her Sensitive Information was accessed and obtained by a third party without her consent or authorization, Plaintiff Morehart suffered injury from a loss of privacy.

154.    Plaintiff Morehart has been further injured by the damages to and diminution in value of her Sensitive Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff Morehart was deprived of when her Sensitive Information was placed on a publicly accessible database, exfiltrated by cybercriminals, and later placed for sale on the dark web.

155.    Plaintiff Morehart suffered actual misuse of her Sensitive Information due to the theft of her Sensitive Information in the Data Breach. Further, on April 8, 2026 and April 15, 2026, Plaintiff Morehart received notifications that her email address was found on the dark web.

Because Plaintiff Morehart's Sensitive Information was among the Sensitive Information stolen in the Data Breach, the appearance of such personal information on the dark web is directly attributable to the Data Breach. Moreover, following the Data Breach, Plaintiff Morehart also suffered multiple fraudulent charges to her M&T Bank account, requiring her to obtain a new debit card on each occasion. Specifically, on February 25, 2026, February 27, 2026, and March 28, 2026 Plaintiff Morehart received notifications from M&T Bank that unauthorized purchases were made to her account for $29.46 at CreditBuilderIQ. Plaintiff Morehart has never purchased or attempted to purchase any services from CreditBuilderIQ.

156.    The Data Breach and actual misuse of her Sensitive Information has caused Plaintiff Morehart to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from her Sensitive Information being stolen and placed in the hands of criminals.

157.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Morehart to spend significant time dealing with issues related to the Data Breach, which includes time spent: (i) researching the Data Breach; (ii) continuously monitoring her financial accounts for additional instances of fraudulent activity; and (iii) contacting M&T Bank to receive new debit cards after each fraudulent charge.

158.    The substantial risk of imminent harm and loss of privacy have both caused Plaintiff Morehart to suffer stress, fear, and anxiety.

159.    Plaintiff Morehart has a continuing interest in ensuring that her Sensitive Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

***Plaintiff Glen Harbin***

160. Plaintiff Glen Harbin is an adult individual and a natural person residing in Solon, Ohio where he intends to stay.

161. On or around March 17, 2026, Plaintiff Harbin received a Notice of Data Incident letter from Defendant informing him that his Sensitive Information was stolen in the Data Breach.

162. As a condition of being a patient/member of a medical organization that utilizes Defendant's services, Plaintiff Harbin provided his Sensitive Information to Defendant with the reasonable expectation that Defendant would take reasonable precautions to protect his confidential Sensitive Information.

163. Plaintiff Harbin is a reasonably cautious person and is therefore careful about sharing his Sensitive Information. As a result, he has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source. Plaintiff stores any documents containing his Sensitive Information in a safe and secure location or destroys the documents. Moreover, Plaintiff Harbin diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure his information is as protected as it can be.

164. Plaintiff Harbin only allowed Defendant to maintain, store, and use his Sensitive Information because he believed that Defendant would use basic security measures to protect his Sensitive Information, such as requiring passwords and multi-factor authentication to access databases storing his Sensitive Information. As a result, Plaintiff Harbin's Sensitive Information was within the possession and control of Defendant at the time of the Data Breach.

165. In the instant that his Sensitive Information was accessed and obtained by a third party without his consent or authorization, Plaintiff Harbin suffered injury from a loss of privacy.

166.    Plaintiff Harbin has been further injured by the damages to and diminution in value of his Sensitive Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff Harbin was deprived of when his Sensitive Information was placed on a publicly accessible database and exfiltrated by cybercriminals.

167.    Plaintiff Harbin has suffered actual misuse of his Sensitive Information due to the theft of his Sensitive Information in the Data Breach.

168.    The Data Breach has also caused Plaintiff Harbin to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from his Sensitive Information being stolen and placed in the hands of criminals.

169.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Harbin to spend significant time dealing with issues related to the Data Breach, which includes time spent: (i) researching the Data Breach; and (ii) continuously monitoring his accounts for suspicious activity.

170.    The substantial risk of imminent harm and loss of privacy have both caused Plaintiff Harbin to suffer stress, fear, and anxiety.

171.    Plaintiff Harbin has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### *Plaintiff Toby Parcell*

172.    Plaintiff Toby Parcell is an adult individual and a natural person residing in Wichita, Kansas where he intends to stay.

173.    On or around March 17, 2026, Plaintiff Parcell received a Notice of Data Incident letter from Defendant informing him that his Sensitive Information was stolen in the Data Breach.

174. As a condition of being a patient/member of a medical organization that utilizes Defendant's services, Plaintiff Parcell provided his Sensitive Information to Defendant with the reasonable expectation that Defendant would take reasonable precautions to protect his confidential Sensitive Information.

175. Plaintiff Parcell is a reasonably cautious person and is therefore careful about sharing his Sensitive Information. As a result, he has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source. Plaintiff stores any documents containing his Sensitive Information in a safe and secure location or destroys the documents. Moreover, Plaintiff Parcell diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure his information is as protected as it can be.

176. Plaintiff Parcell only allowed Defendant to maintain, store, and use his Sensitive Information because he believed that Defendant would use basic security measures to protect his Sensitive Information, such as requiring passwords and multi-factor authentication to access databases storing his Sensitive Information. As a result, Plaintiff Parcell's Sensitive Information was within the possession and control of Defendant at the time of the Data Breach.

177. In the instant that his Sensitive Information was accessed and obtained by a third party without his consent or authorization, Plaintiff Parcell suffered injury from a loss of privacy.

178. Plaintiff Parcell has been further injured by the damages to and diminution in value of his Sensitive Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff Parcell was deprived of when his Sensitive Information was placed on a publicly accessible database and exfiltrated by cybercriminals.

179.    Plaintiff Parcell has suffered actual misuse of his Sensitive Information due to the theft of his Sensitive Information in the Data Breach.

180.    The Data Breach has also caused Plaintiff Parcell to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from his Sensitive Information being stolen and placed in the hands of criminals.

181.    In addition to the increased risk and the actual harm suffered, the Data Breach has caused Plaintiff Parcell to spend significant time dealing with issues related to the Data Breach, which includes time spent: (i) researching the Data Breach; and (ii) continuously monitoring his accounts for suspicious activity.

182.    The substantial risk of imminent harm and loss of privacy have both caused Plaintiff Parcell to suffer stress, fear, and anxiety.

183.    Plaintiff Parcell has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

***Plaintiff Melissa Alverez***

184.    In 2025, Plaintiff Alvarez sought medical treatment through the telehealth platform MEDVi for the purpose of obtaining GLP-1 medications.

185.    Among Defendant's partners is MEDVi, a telehealth platform specializing in GLP-1 medication programs for weight loss. As stated on MEDVi's own website: "OpenLoop Health, a network of US-licensed doctors that adhere to rigorous medical protocols designed for patient safety, has established exclusionary criteria to determine if an individual does not qualify for GLP-1s. The answers an individual provides to the MEDVi assessment consequently determine if the

individual is screened out of eligibility for GLP-1 medication, and an OpenLoop Health clinician will meet with an individual after checkout to determine if they qualify for a prescription."[35]

186.    MEDVi provides its clinical services through Defendant OpenLoop Health.

187.    As a condition of receiving telehealth services and GLP-1 medication prescriptions through MEDVi's platform, Plaintiff Alvarez was required to provide her sensitive personal and medical information, which was transmitted to and collected, maintained, and stored by Defendant.

188.    Plaintiff Alvarez entrusted her Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would protect and secure this information from unauthorized access and disclosure.

189.    By soliciting and accepting Plaintiff Alvarez's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

190.    On information and belief, Defendant was in possession of Plaintiff Alvarez's Sensitive Information—including her name, date of birth, address, email address, phone number, IP address, medical history, prescription information, body measurements, health indicators, and/or other health and personal data—before, during, and after it was improperly accessed or obtained by the threat actor "stuckin2019" when the Data Breach occurred.

191.    Plaintiff Alvarez reasonably expected and understood that Defendant would take, at a minimum, industry standard precautions to protect, maintain, and safeguard her Sensitive Information from unauthorized users or disclosure. Plaintiff Alvarez would not have used Defendant's services—or the services of Defendant's partner platform MEDVi—had she known that Defendant would not take reasonable steps to safeguard her Sensitive Information.

---

35 MEDVi, *Terms and Conditions* (Mar. 31, 2026) https://glp.medvi.org/terms-and-conditions.html.

192. Plaintiff is very careful about sharing her sensitive PII and PHI. Furthermore, Plaintiff Alvarez stores any documents containing her sensitive information in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

193. As a result of the Data Breach and Defendant's failure to notify, Plaintiff Alvarez made reasonable efforts to mitigate the impact, including but not limited to researching the Data Breach, reviewing financial statements, monitoring her credit information, implementing credit freezes, and changing passwords on her various accounts.

194. In or around January 2026, following the Data Breach, Plaintiff Alvarez received multiple fraud attempt alerts from her bank which required her to change her bank account and credit/debit card numbers. Upon information and belief, Plaintiff Alvarez estimates she has already spent hours responding to the Data Breach.

195. Due to the Data Breach, Plaintiff Alvarez anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address harms caused by the breach. This includes ongoing credit monitoring, changing passwords, monitoring her medical history and health insurance information, and monitoring her other accounts for fraudulent activity.

196. Plaintiff Alvarez has already experienced a significant increase in spam calls and phishing attempts, including pre-recordings and emails asking her to provide her personal financial information.

197. Plaintiff Alvarez suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has experienced anxiety and increased concerns for the loss of her privacy, as well as anxiety over the impact of cybercriminals publicly posting or selling her PII and PHI.

198.    Because of the Data Breach, there is no doubt Plaintiff Alvarez's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Alvarez and the Class are at an imminent risk of identity theft and fraud.

199.    Due to Defendant's Data Breach, Plaintiff Alvarez will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Data Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Alvarez's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

200.    Plaintiff Alvarez's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

201.    Knowing that thieves intentionally targeted and accessed her Sensitive Information, has caused Plaintiff Alvarez great anxiety beyond mere worry.

202.    The Data Breach has caused Plaintiff Alvarez to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

203.    Plaintiff Alvarez has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

204.    As a direct and traceable result of the Data Breach, Plaintiff Alvarez suffered actual injury and damages after her Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and expense related to monitoring her accounts

and credit reports for fraudulent activity; (ii) loss of privacy due to her Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Sensitive Information; (iv) emotional distress because identity thieves now possess her first and last name paired with her medical information and other sensitive information; (v) continuous imminent and impending injury arising from the increased risk of financial, medical, and identity fraud and theft now that her Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of her Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Alvarez and/or her medical providers; (vii) entrusting her Sensitive Information to Defendant that she would not have had Defendant disclosed it lacked data security practices adequate to safeguard the Sensitive Information of individuals whose data it stored; and (viii) other economic and non-economic harm.

205. Plaintiff Alvarez has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

206. Plaintiff Alvarez has a continuing interest in ensuring that her PII and PHI, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches. Absent Court intervention, Plaintiff Alvarez's Sensitive Information will be wholly unprotected and at-risk of future data beaches.

### *Plaintiff Collena Allen*

207. Plaintiff Allen is a patient/member of a medical organization that utilizes Defendant's services and was required to provide her Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

208.    Plaintiff Allen provided her Sensitive Information in connection with Defendant's provision of its services. Defendant obtained and continues to maintain Plaintiff's PII and PHI and has a legal duty and obligation to protect that PII and PHI from unauthorized access and disclosure.

209.    Plaintiff Allen would not have entrusted her PII and PHI to Defendant had she known that Defendant failed to maintain adequate data security.

210.    After learning of the Data Breach, Plaintiff Allen subsequently spent time taking action to mitigate the impact of the Data Breach, including researching the Data Breach, researching ways to protect herself from data breaches, and reviewing her financial accounts for fraud or suspicious activity. She now plans to spend several hours a month checking account statements for irregularities.

211.    Plaintiff Allen will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

212.    Plaintiff Allen places significant value in the security of her Sensitive Information and does not readily disclose it. Plaintiff Allen entrusted Defendant with her Sensitive Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Sensitive Information would not be compromised.

213.    Because of the Data Breach, there is no doubt Plaintiff Allen's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Allen and the Class are at an imminent risk of identity theft and fraud.

214.    Due to Defendant's Data Breach, Plaintiff Allen will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Allen's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

215.    Plaintiff Allen's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

216.    Knowing that thieves intentionally targeted and accessed his Sensitive Information, has caused Plaintiff Allen great anxiety beyond mere worry.

217.    The Data Breach has caused Plaintiff Allen to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

218.    Plaintiff Allen has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

219.    As a direct and traceable result of the Data Breach, Plaintiff Allen suffered actual injury and damages after her Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect his Sensitive Information; (iv) emotional distress because identity thieves now possess her first and last name paired with his medical information and other sensitive

information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of his Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Allen and/or her medical providers; and (vii) other economic and non-economic harm.

220.    Plaintiff Allen has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

221.    Plaintiff Allen has a continuing interest in ensuring that her Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Allen's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

### *Plaintiff Toni Mendosa*

222.    Plaintiff Mendosa is a patient/member of a medical organization that utilizes Defendant's services, and was required to provide her Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

223.    Plaintiff Mendosa entrusted her Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep her Sensitive Information secure from unauthorized access.

224.    By soliciting and accepting Plaintiff Mendosa' Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

225. Upon information and belief, Defendant was in possession of Plaintiff Mendosa' Sensitive Information before, during, and after the Data Breach. Plaintiff Mendosa's Sensitive Information was compromised in the Data Breach.

226. Following the Data Breach, Plaintiff Mendosa made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, researching how to protect herself against identity theft, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. Plaintiff Mendosa estimates she now spends hours each month monitoring her accounts as a result of the Data Breach.

227. Plaintiff Mendosa will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

228. Plaintiff Mendosa places significant value in the security of her Sensitive Information and does not readily disclose it. Plaintiff Mendosa entrusted Defendant with her Sensitive Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Sensitive Information would not be compromised.

229. Because of the Data Breach, there is no doubt Plaintiff Mendosa's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the *modus operandi* of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Mendosa and the Class are at an imminent risk of identity theft and fraud.

230. Additionally, Plaintiff Mendosa has noticed a marked increase in spam texts and phone calls using her compromised Private Information since the date of the Data Breach.

231.    Due to Defendant's Data Breach, Plaintiff Mendosa will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen and the fact that her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Mendosa's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

232.    Plaintiff Mendosa' highly confidential Sensitive Information accessed in the Data Breach provides hackers with a clear ability to commit fraud.

233.    Knowing that thieves intentionally targeted and accessed her Sensitive Information, has caused Plaintiff Mendosa great anxiety beyond mere worry. Plaintiff Mendosa has suffered from anxiety, concern, and unease about unauthorized parties viewing and potentially using her Sensitive Information due to Defendant's Data Breach, which is been compounded by Defendant's delay in notifying her of the fact that her Sensitive Information was acquired by criminals as a result of the Data Breach.

234.    Plaintiff Mendosa has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

235.    As a direct and traceable result of the Data Breach, Plaintiff Mendosa suffered actual injury and damages after her Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect her Sensitive Information; (iv) emotional distress because identity thieves now possess her first and last name paired with her medical information and other sensitive

data; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of her Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Mendosa and/or her providers; and (vii) other economic and non-economic harm.

236.    Plaintiff Mendosa has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

237.    Plaintiff Mendosa has a continuing interest in ensuring that her Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Mendosa's Sensitive Information will be wholly unprotected and at risk of future data breaches.

### *Plaintiff David Appleman*

238.    Plaintiff Appleman is a patient/member of a medical organization that utilizes Defendant's services and was required to provide his Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

239.    Plaintiff Appleman received a notice letter from Defendant dated March 17, 2026, stating that his Sensitive Information was impacted by the Data Breach.

240.    Plaintiff Appleman entrusted his Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep his Sensitive Information secure from unauthorized access.

241.    By soliciting and accepting Plaintiff Appleman's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

242.   Upon information and belief, Defendant was in possession of Plaintiff Appleman's Sensitive Information before, during, and after the Data Breach.

243.   Following the Data Breach, upon information and belief, Plaintiff Appleman made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Upon information and belief, Plaintiff Appleman estimates he has already spent hours responding to the Data Breach.

244.   Plaintiff Appleman will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

245.   Plaintiff Appleman places significant value in the security of his Sensitive Information and does not readily disclose it. Plaintiff Appleman entrusted Defendant with his Sensitive Information with the understanding that Defendant would keep his information secure and would employ reasonable and adequate data security measures to ensure that his Sensitive Information would not be compromised.

246.   Because of the Data Breach, there is no doubt Plaintiff Appleman's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Appleman and the Class are at an imminent risk of identity theft and fraud.

247.   Plaintiff Appleman has noticed a marked increase in spam texts and phone calls since the date of the Data Breach.

248.    Since the date of the Data Breach, Plaintiff Appleman receives about 30 spam emails per day and about 15 spam calls per day. Much of this spam concerns loans and life insurance that Plaintiff Appleman neither applied for nor inquired about.

249.    Since the date of the Data Breach, Plaintiff Appleman has also had multiple unauthorized login attempts to several of his accounts such as Wells Fargo and PayPal.

250.    Due to Defendant's Data Breach, Plaintiff Appleman will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Appleman's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

251.    Plaintiff Appleman's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

252.    Knowing that thieves intentionally targeted and accessed his Sensitive Information, has caused Plaintiff Appleman great anxiety beyond mere worry.

253.    The Data Breach has caused Plaintiff Appleman to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

254.    Plaintiff Appleman has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

255.    As a direct and traceable result of the Data Breach, Plaintiff Appleman suffered actual injury and damages after his Sensitive Information was compromised and stolen in the Data

50

Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Sensitive Information; (iv) emotional distress because identity thieves now possess his first and last name paired with his medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of his Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Appleman and/or his medical providers; and (vii) other economic and non-economic harm.

256.    Plaintiff Appleman has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

257.    Plaintiff Appleman has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Appleman's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

### *Plaintiff Theodore Bartolo*

258.    Plaintiff Bartolo is a patient/member of a medical organization that utilizes Defendant's services and was required to provide his Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

259.    Plaintiff Bartolo received a notice letter from Defendant dated March 17, 2026, stating that his Sensitive Information was impacted by the Data Breach.

51

260.    Plaintiff Bartolo entrusted his Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep his Sensitive Information secure from unauthorized access.

261.    By soliciting and accepting Plaintiff Bartolo's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

262.    Upon information and belief, Defendant was in possession of Plaintiff Bartolo's Sensitive Information before, during, and after the Data Breach.

263.    Following the Data Breach, upon information and belief, Plaintiff Bartolo made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Upon information and belief, Plaintiff estimates he has already spent hours responding to the Data Breach.

264.    Plaintiff Bartolo will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

265.    Plaintiff Bartolo places significant value in the security of his Sensitive Information and does not readily disclose it. Plaintiff Bartolo entrusted Defendant with his Sensitive Information with the understanding that Defendant would keep his information secure and would employ reasonable and adequate data security measures to ensure that his Sensitive Information would not be compromised.

266.    Because of the Data Breach, there is no doubt Plaintiff Bartolo's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of

cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Bartolo and the Class are at an imminent risk of identity theft and fraud.

267. Plaintiff Bartolo has noticed a marked increase in spam calls since the date of the Data Breach.

268. Since the date of the Data Breach, Plaintiff Bartolo has received around 15 spam calls per day, up from the 1-2 per week he received, if any, before the Data Breach. Many of these spam calls have referenced his specific health information in order to sell him medical products and services.

269. Due to Defendant's Data Breach, Plaintiff Bartolo will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Bartolo's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

270. Plaintiff Bartolo's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

271. Knowing that thieves intentionally targeted and accessed his Sensitive Information, has caused Plaintiff Bartolo great anxiety beyond mere worry.

272. The Data Breach has caused Plaintiff Bartolo to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

273.    Plaintiff Bartolo has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

274.    As a direct and traceable result of the Data Breach, Plaintiff Bartolo suffered actual injury and damages after his Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Sensitive Information; (iv) emotional distress because identity thieves now possess his first and last name paired with his medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of his Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Bartolo and/or his medical providers; and (vii) other economic and non-economic harm.

275.    Plaintiff Bartolo has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

276.    Plaintiff Bartolo has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Bartolo's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Alli Brunell***

54

277. Plaintiff Brunell is a patient/member of a medical organization that utilizes Defendant's services and was required to provide her Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

278. Plaintiff Brunell received a notice letter from Defendant dated March 17, 2026, stating that her Sensitive Information was impacted by the Data Breach.

279. Plaintiff Brunell entrusted her Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep her Sensitive Information secure from unauthorized access.

280. By soliciting and accepting Plaintiff Brunell's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

281. Upon information and belief, Defendant was in possession of Plaintiff Brunell's Sensitive Information before, during, and after the Data Breach.

282. Following the Data Breach, upon information and belief, Plaintiff Sensitive made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. Upon information and belief, Plaintiff Brunell estimates she has already spent hours responding to the Data Breach.

283. Plaintiff Brunell will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

284. Plaintiff Brunell places significant value in the security of her Sensitive Information and does not readily disclose it. Plaintiff Brunell entrusted Defendant with her Sensitive Information with the understanding that Defendant would keep her information secure and would

employ reasonable and adequate data security measures to ensure that her Sensitive Information would not be compromised.

285. Because of the Data Breach, there is no doubt Plaintiff Brunell's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Brunell and the Class are at an imminent risk of identity theft and fraud.

286. Plaintiff Brunell has noticed a marked increase in spam texts and phone calls since the date of the Data Breach.

287. Since the date of the Data Breach, Plaintiff Brunell has also experienced multiple unauthorized attempts to login to several of her accounts, including her Robinhood and PayPal accounts.

288. Due to Defendant's Data Breach, Plaintiff Brunell will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Brunell's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

289. Plaintiff Brunell's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

290. Knowing that thieves intentionally targeted and accessed her Sensitive Information, has caused Plaintiff Brunell great anxiety beyond mere worry.

291.    The Data Breach has caused Plaintiff Brunell to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

292.    Plaintiff Brunell has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

293.    As a direct and traceable result of the Data Breach, Plaintiff Brunell suffered actual injury and damages after her Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Sensitive Information; (iv) emotional distress because identity thieves now possess her first and last name paired with her medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of her Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Brunell and/or her medical providers; and (vii) other economic and non-economic harm.

294.    Plaintiff Brunell has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

295.    Plaintiff Brunell has a continuing interest in ensuring that her Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is

protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Brunell's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Joby Childress***

296.    Plaintiff Childress is a patient/member of a medical organization that utilizes Defendant's services and was required to provide his Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

297.    Plaintiff Childress received a notice letter from Defendant dated March 17, 2026, stating that his Sensitive Information was impacted by the Data Breach.

298.    Plaintiff Childress entrusted his Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep his Sensitive Information secure from unauthorized access.

299.    By soliciting and accepting Plaintiff Childress' Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

300.    Upon information and belief, Defendant was in possession of Plaintiff Childress' Sensitive Information before, during, and after the Data Breach.

301.    Following the Data Breach, upon information and belief, Plaintiff Childress made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Upon information and belief, Plaintiff Childress estimates he has already spent hours responding to the Data Breach.

302.    Plaintiff Childress will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

303.    Plaintiff Childress places significant value in the security of his Sensitive Information and does not readily disclose it. Plaintiff Childress entrusted Defendant with his Sensitive Information with the understanding that Defendant would keep his information secure and would employ reasonable and adequate data security measures to ensure that his Sensitive Information would not be compromised.

304.    Because of the Data Breach, there is no doubt Plaintiff Childress' highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Childress and the Class are at an imminent risk of identity theft and fraud.

305.    Plaintiff Childress has noticed a marked increase in spam texts and phone calls since the date of the Data Breach.

306.    Due to Defendant's Data Breach, Plaintiff Childress will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Childress's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

307.    Plaintiff Childress' highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

308.    Knowing that thieves intentionally targeted and accessed his Sensitive Information, has caused Plaintiff Childress great anxiety beyond mere worry.

309.    The Data Breach has caused Plaintiff Childress to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

310.    Plaintiff Childress has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

311.    As a direct and traceable result of the Data Breach, Plaintiff Childress suffered actual injury and damages after his Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Sensitive Information; (iv) emotional distress because identity thieves now possess his first and last name paired with his medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of his Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Childress and/or his medical providers; and (vii) other economic and non-economic harm.

312.    Plaintiff Childress has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

313.    Plaintiff Childress has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is

protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Childress's Sensitive Information will be wholly unprotected and at risk of future data breaches.

### *Plaintiff Marshal Detherage*

314.   Plaintiff Detherage is a patient/member of a medical organization that utilizes Defendant's services and was required to provide his Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

315.   Plaintiff Detherage received a notice letter from Defendant dated March 17, 2026, stating that his Sensitive Information was impacted by the Data Breach.

316.   Plaintiff Detherage entrusted his Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep his Sensitive Information secure from unauthorized access.

317.   By soliciting and accepting Plaintiff Detherage's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

318.   Upon information and belief, Defendant was in possession of Plaintiff Detherage's Sensitive Information before, during, and after the Data Breach.

319.   Following the Data Breach, upon information and belief, Plaintiff Detherage made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Upon information and belief, Plaintiff Detherage estimates he has already spent hours responding to the Data Breach.

320.   Plaintiff Detherage will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

321.    Plaintiff Detherage places significant value in the security of his Sensitive Information and does not readily disclose it. Plaintiff Detherage entrusted Defendant with his Sensitive Information with the understanding that Defendant would keep his information secure and would employ reasonable and adequate data security measures to ensure that his Sensitive Information would not be compromised.

322.    Because of the Data Breach, there is no doubt Plaintiff Detherage's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Detherage and the Class are at an imminent risk of identity theft and fraud.

323.    Plaintiff Detherage has noticed a marked increase in spam texts, emails, and phone calls since the date of the Data Breach.

324.    Since the date of the Data Breach, Plaintiff Detherage has received about 15-20 spam calls per day. Many of these spam calls are either attempts to sell him medical products or services or about loans he neither applied for nor inquired about.

325.    Plaintiff Detherage has also experienced a fraudulent transaction on his credit card. This credit card is the same one Plaintiff Detherage used at the medical organization he is a member/patient of that utilizes Defendant's services. As such, Defendant had this credit card information in its network at the time of the Data Breach.

326.    Due to Defendant's Data Breach, Plaintiff Detherage will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Detherage's Sensitive

Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

327. Plaintiff Detherage's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

328. Knowing that thieves intentionally targeted and accessed his Sensitive Information, has caused Plaintiff Detherage great anxiety beyond mere worry.

329. The Data Breach has caused Plaintiff Detherage to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

330. Plaintiff Detherage has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

331. As a direct and traceable result of the Data Breach, Plaintiff Detherage suffered actual injury and damages after his Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Sensitive Information; (iv) emotional distress because identity thieves now possess his first and last name paired with his medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of his Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Detherage and/or his medical providers; and (vii) other economic and non-economic harm.

332.    Plaintiff Detherage has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

333.    Plaintiff Detherage has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Detherage's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Jennifer Glodek***

334.    Plaintiff Glodek is a patient/member of a medical organization that utilizes Defendant's services and was required to provide her Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

335.    Plaintiff Glodek received a notice letter from Defendant dated March 17, 2026, stating that her Sensitive Information was impacted by the Data Breach.

336.    Plaintiff Glodek entrusted her Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep her Sensitive Information secure from unauthorized access.

337.    By soliciting and accepting Plaintiff Glodek's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

338.    Upon information and belief, Defendant was in possession of Plaintiff Glodek's Sensitive Information before, during, and after the Data Breach.

339.    Following the Data Breach, upon information and belief, Plaintiff Glodek made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and

64

reviewing her credit reports. Upon information and belief, Plaintiff Glodek estimates she has already spent hours responding to the Data Breach.

340.    Plaintiff Glodek will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

341.    Plaintiff Glodek places significant value in the security of her Sensitive Information and does not readily disclose it. Plaintiff Glodek entrusted Defendant with her Sensitive Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Sensitive Information would not be compromised.

342.    Because of the Data Breach, there is no doubt Plaintiff Glodek's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Glodek and the Class are at an imminent risk of identity theft and fraud.

343.    Plaintiff Glodek has noticed a marked increase in spam emails and phone calls since the date of the Data Breach.

344.    Since the date of the Data Breach, Plaintiff Glodek has received around 5 spam emails and 10 spam calls per day. The spam emails have concerned loan approvals that Plaintiff Glodek neither applied for nor inquired about.

345.    Due to Defendant's Breach, Plaintiff Glodek will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a

consequence of Defendant's breach of duty to maintain Plaintiff Glodek's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

346.    Plaintiff Glodek's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

347.    Knowing that thieves intentionally targeted and accessed her Sensitive Information, has caused Plaintiff Glodek great anxiety beyond mere worry.

348.    The Data Breach has caused Plaintiff Glodek to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

349.    Plaintiff Glodek has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

350.    As a direct and traceable result of the Data Breach, Plaintiff Glodek suffered actual injury and damages after her Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Sensitive Information; (iv) emotional distress because identity thieves now possess her first and last name paired with her medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of her Sensitive Information, a form of intangible property that

Defendant obtained from Plaintiff Glodek and/or her medical providers; and (vii) other economic and non-economic harm.

351.    Plaintiff Glodek has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

352.    Plaintiff Glodek has a continuing interest in ensuring that her Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Glodek's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

### *Plaintiff Autumn Andrews*

353.    Plaintiff Andrews is a patient/member of a medical organization that utilizes Defendant's services and was required to provide her Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

354.    Plaintiff Andrews received a notice letter from Defendant dated March 17, 2026, stating that her Sensitive Information was impacted by the Data Breach.

355.    Plaintiff Andrews entrusted her Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep her Sensitive Information secure from unauthorized access.

356.    By soliciting and accepting Plaintiff Andrews's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

357.    Upon information and belief, Defendant was in possession of Plaintiff Andrews's Sensitive Information before, during, and after the Data Breach.

358. Following the Data Breach, upon information and belief, Plaintiff Andrews made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. Upon information and belief, Plaintiff Andrews estimates she has already spent hours responding to the Data Breach.

359. Plaintiff Andrews will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

360. Plaintiff Andrews places significant value in the security of her Sensitive Information and does not readily disclose it. Plaintiff Andrews entrusted Defendant with her Sensitive Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Sensitive Information would not be compromised.

361. Because of the Data Breach, there is no doubt Plaintiff Andrews's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Andrews and the Class are at an imminent risk of identity theft and fraud.

362. Plaintiff Andrews has noticed a marked increase in spam phone calls since the date of the Data Breach.

363. Since the date of the Data Breach, Plaintiff Andrews receives about 10 spam calls a day. Most of these spam calls concern loans she neither applied for nor inquired about.

364. Due to Defendant's Breach, Plaintiff Andrews will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data

stolen in the Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Andrews's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

365. Plaintiff Andrews's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

366. Knowing that thieves intentionally targeted and accessed her Sensitive Information, has caused Plaintiff Andrews great anxiety beyond mere worry.

367. The Data Breach has caused Plaintiff Andrews to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

368. Plaintiff Andrews has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

369. As a direct and traceable result of the Data Breach, Plaintiff Andrews suffered actual injury and damages after her Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Sensitive Information; (iv) emotional distress because identity thieves now possess her first and last name paired with her medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Sensitive Information has been stolen and published on the dark web;

(vi) diminution in the value of her Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Andrews and/or her medical providers; and (vii) other economic and non-economic harm.

370.    Plaintiff Andrews has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

371.    Plaintiff Andrews has a continuing interest in ensuring that her Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Andrews's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

### *Serena Gold-Peters*

372.    Plaintiff Gold-Peters is a patient/member of a medical organization that utilizes Defendant's services and was required to provide her Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

373.    Plaintiff Gold-Peters received a notice letter from Defendant dated March 17, 2026, stating that her Sensitive Information was impacted by the Data Breach.

374.    Plaintiff Gold-Peters entrusted her Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep her Sensitive Information secure from unauthorized access.

375.    By soliciting and accepting Plaintiff Gold-Peters' Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

376.    Upon information and belief, Defendant was in possession of Plaintiff Gold-Peters' Sensitive Information before, during, and after the Data Breach.

377.    Following the Data Breach, upon information and belief, Plaintiff Gold-Peters made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. Upon information and belief, Plaintiff Gold-Peters estimates she has already spent hours responding to the Data Breach.

378.    Plaintiff Gold-Peters will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

379.    Plaintiff Gold-Peters places significant value in the security of her Sensitive Information and does not readily disclose it. Plaintiff Gold-Peters entrusted Defendant with her Sensitive Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Sensitive Information would not be compromised.

380.    Because of the Data Breach, there is no doubt Plaintiff Gold-Peters' highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Gold-Peters and the Class are at an imminent risk of identity theft and fraud.

381.    Plaintiff Gold-Peters has noticed a marked increase in spam emails and phone calls since the date of the Data Breach.

382.    Since the date of the Data Breach, Plaintiff Gold-Peters has received around 40 spam calls, which is a drastic increase from the roughly one per month she received before the Data Breach.

383.    Since the date of the Data Breach, Plaintiff Gold-Peters has also received targeted spam emails that have included her Sensitive Information in an effort to enhance the phishing attempts.

384.    Due to Defendant's Breach, Plaintiff Gold-Peters will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Gold-Peters' Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

385.    Plaintiff Gold-Peters' highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

386.    Knowing that thieves intentionally targeted and accessed her Sensitive Information, has caused Plaintiff Gold-Peters great anxiety beyond mere worry.

387.    The Data Breach has caused Plaintiff Gold-Peters to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

388.    Plaintiff Gold-Peters has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

389.    As a direct and traceable result of the Data Breach, Plaintiff Gold-Peters suffered actual injury and damages after her Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Sensitive Information; (iv) emotional distress because identity thieves now possess her first and last name paired with her medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of her Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Gold-Peters and/or her medical providers; and (vii) other economic and non-economic harm.

390.    Plaintiff Gold-Peters has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

391.    Plaintiff Gold-Peters has a continuing interest in ensuring that her Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Gold-Peters' Sensitive Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Charles Ligon***

392.    Plaintiff Ligon is a patient/member of a medical organization that utilizes Defendant's services and was required to provide his Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

393.    Plaintiff Ligon received a notice letter from Defendant dated March 17, 2026, stating that his Sensitive Information was impacted by the Data Breach.

394.    Plaintiff Ligon entrusted his Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep his Sensitive Information secure from unauthorized access.

395.    By soliciting and accepting Plaintiff Ligon's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

396.    Upon information and belief, Defendant was in possession of Plaintiff Ligon's Sensitive Information before, during, and after the Data Breach.

397.    Following the Data Breach, upon information and belief, Plaintiff Ligon made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Upon information and belief, Plaintiff Ligon estimates he has already spent hours responding to the Data Breach.

398.    Plaintiff Ligon will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

399.    Plaintiff Ligon places significant value in the security of his Sensitive Information and does not readily disclose it. Plaintiff Ligon entrusted Defendant with his Sensitive Information with the understanding that Defendant would keep his information secure and would employ

74

reasonable and adequate data security measures to ensure that his Sensitive Information would not be compromised.

400. Because of the Data Breach, there is no doubt Plaintiff Ligon's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Ligon and the Class are at an imminent risk of identity theft and fraud.

401. Plaintiff Ligon has noticed a marked increase in spam texts and phone calls since the date of the Data Breach.

402. Since the date of the Data Breach, Plaintiff Ligon has received around 5 spam calls per day; he also received many texts concerning loans he neither applied for nor inquired about.

403. Since the date of the data breach, Plaintiff Ligon has also experienced multiple unauthorized login attempts to several of his personal accounts.

404. Due to Defendant's Breach, Plaintiff Ligon will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Ligon's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

405. Plaintiff Ligon's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

406. Knowing that thieves intentionally targeted and accessed his Sensitive Information, has caused Plaintiff Ligon great anxiety beyond mere worry.

75

407. The Data Breach has caused Plaintiff Ligon to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying his of the fact that his Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

408. Plaintiff Ligon has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

409. As a direct and traceable result of the Data Breach, Plaintiff Ligon suffered actual injury and damages after his Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Sensitive Information; (iv) emotional distress because identity thieves now possess his first and last name paired with her medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of his Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Ligon and/or his medical providers; and (vii) other economic and non-economic harm.

410. Plaintiff Ligon has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

411. Plaintiff Ligon has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and

safeguarded from future data breaches. Absent Court intervention, Plaintiff Ligon's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Tasha Mathis***

412.    Plaintiff Mathis is a patient/member of a medical organization that utilizes Defendant's services and was required to provide her Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

413.    Plaintiff Mathis received a notice letter from Defendant dated March 17, 2026, stating that her Sensitive Information was impacted by the Data Breach.

414.    Plaintiff Mathis entrusted her Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep her Sensitive Information secure from unauthorized access.

415.    By soliciting and accepting Plaintiff Mathis's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

416.    Upon information and belief, Defendant was in possession of Plaintiff Mathis's Sensitive Information before, during, and after the Data Breach.

417.    Following the Data Breach, upon information and belief, Plaintiff Mathis made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. Upon information and belief, Plaintiff Mathis estimates she has already spent hours responding to the Data Breach.

418.    Plaintiff Mathis will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

419. Plaintiff Mathis places significant value in the security of her Sensitive Information and does not readily disclose it. Plaintiff Mathis entrusted Defendant with her Sensitive Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Sensitive Information would not be compromised.

420. Because of the Data Breach, there is no doubt Plaintiff Mathis's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Mathis and the Class are at an imminent risk of identity theft and fraud.

421. Plaintiff Mathis has noticed a marked increase in spam texts and phone calls since the date of the Data Breach.

422. Since the date of the Data Breach, Plaintiff Mathis receives about 5-10 spam calls per day. Many of these spam calls concern loans she neither applied for nor inquired about.

423. Due to Defendant's Breach, Plaintiff Mathis will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Mathis's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

424. Plaintiff Mathis's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

425.    Knowing that thieves intentionally targeted and accessed her Sensitive Information, has caused Plaintiff Mathis great anxiety beyond mere worry.

426.    The Data Breach has caused Plaintiff Mathis to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

427.    Plaintiff Mathis has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

428.    As a direct and traceable result of the Data Breach, Plaintiff Mathis suffered actual injury and damages after her Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Sensitive Information; (iv) emotional distress because identity thieves now possess her first and last name paired with her medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of her Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Mathis and/or her medical providers; and (vii) other economic and non-economic harm.

429.    Plaintiff Mathis has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

430.    Plaintiff Mathis has a continuing interest in ensuring that her Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Mathis's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

### *Plaintiff Michael Plante*

431.    Plaintiff Plante is a patient/member of a medical organization that utilizes Defendant's services and was required to provide his Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

432.    Plaintiff Plante received a notice letter from Defendant dated March 17, 2026, stating that his Sensitive Information was impacted by the Data Breach.

433.    Plaintiff Plante entrusted his Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep his Sensitive Information secure from unauthorized access.

434.    By soliciting and accepting Plaintiff Plante's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

435.    Upon information and belief, Defendant was in possession of Plaintiff Plante's Sensitive Information before, during, and after the Data Breach.

436.    Following the Data Breach, upon information and belief, Plaintiff Plante made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Upon information and belief, Plaintiff Plante estimates he has already spent hours responding to the Data Breach.

437.    Plaintiff Plante will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

438.    Plaintiff Plante places significant value in the security of his Sensitive Information and does not readily disclose it. Plaintiff Plante entrusted Defendant with his Sensitive Information with the understanding that Defendant would keep his information secure and would employ reasonable and adequate data security measures to ensure that his Sensitive Information would not be compromised.

439.    Because of the Data Breach, there is no doubt Plaintiff Plante's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Plante and the Class are at an imminent risk of identity theft and fraud.

440.    Plaintiff Plante has noticed a marked increase in spam texts and phone calls since the date of the Data Breach.

441.    Due to Defendant's Breach, Plaintiff Plante will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Plante's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

442.    Plaintiff Plante's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

443. Knowing that thieves intentionally targeted and accessed his Sensitive Information, has caused Plaintiff Plante great anxiety beyond mere worry.

444. The Data Breach has caused Plaintiff Plante to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that his Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

445. Plaintiff Plante has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

446. As a direct and traceable result of the Data Breach, Plaintiff Plante suffered actual injury and damages after his Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Sensitive Information; (iv) emotional distress because identity thieves now possess his first and last name paired with his medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of his Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Plante and/or his medical providers; and (vii) other economic and non-economic harm.

447. Plaintiff Plante has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

448.    Plaintiff Plante has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Plante's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

***Plaintiff Jasmine Walker***

449.    Plaintiff Walker is a patient/member of a medical organization that utilizes Defendant's services and was required to provide her Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

450.    Plaintiff Walker received a notice letter from Defendant dated March 17, 2026, stating that her Sensitive Information was impacted by the Data Breach.

451.    Plaintiff Walker entrusted her Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep her Sensitive Information secure from unauthorized access.

452.    By soliciting and accepting Plaintiff Walker's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

453.    Upon information and belief, Defendant was in possession of Plaintiff Walker's Sensitive Information before, during, and after the Data Breach.

454.    Following the Data Breach, upon information and belief, Plaintiff Walker made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. Upon information and belief, Plaintiff Walker estimates she has already spent hours responding to the Data Breach.

455. Plaintiff Walker will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

456. Plaintiff Walker places significant value in the security of her Sensitive Information and does not readily disclose it. Plaintiff Walker entrusted Defendant with her Sensitive Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Sensitive Information would not be compromised.

457. Because of the Data Breach, there is no doubt Plaintiff Walker's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Walker and the Class are at an imminent risk of identity theft and fraud.

458. Plaintiff Walker has noticed a marked increase in spam texts and phone calls since the date of the Data Breach.

459. Due to Defendant's Breach, Plaintiff Walker will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Walker's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

460. Plaintiff Walker's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

461.    Knowing that thieves intentionally targeted and accessed her Sensitive Information, has caused Plaintiff Walker great anxiety beyond mere worry.

462.    The Data Breach has caused Plaintiff Walker to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

463.    Plaintiff Walker has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

464.    As a direct and traceable result of the Data Breach, Plaintiff Walker suffered actual injury and damages after her Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Sensitive Information; (iv) emotional distress because identity thieves now possess her first and last name paired with her medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of her Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Walker and/or her medical providers; and (vii) other economic and non-economic harm.

465.    Plaintiff Walker has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

466. Plaintiff Walker has a continuing interest in ensuring that her Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Walker's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

### *Plaintiff Mark Williams*

467. Plaintiff Williams is a patient/member of a medical organization that utilizes Defendant's services and was required to provide his Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

468. Plaintiff Williams received a notice letter from Defendant dated March 17, 2026, stating that his Sensitive Information was impacted by the Data Breach.

469. Plaintiff Williams entrusted his Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep his Sensitive Information secure from unauthorized access.

470. By soliciting and accepting Plaintiff Williams' Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

471. Upon information and belief, Defendant was in possession of Plaintiff Williams' Sensitive Information before, during, and after the Data Breach.

472. Following the Data Breach, upon information and belief, Plaintiff Williams made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Upon information and belief, Plaintiff Williams estimates he has already spent hours responding to the Data Breach.

473. Plaintiff Williams will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

474. Plaintiff Williams places significant value in the security of his Sensitive Information and does not readily disclose it. Plaintiff Williams entrusted Defendant with his Sensitive Information with the understanding that Defendant would keep his information secure and would employ reasonable and adequate data security measures to ensure that his Sensitive Information would not be compromised.

475. Because of the Data Breach, there is no doubt Plaintiff Williams' highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Williams and the Class are at an imminent risk of identity theft and fraud.

476. Plaintiff Williams has noticed a marked increase in spam emails and phone calls since the date of the Data Breach.

477. Since the date of the Data Breach, Plaintiff Williams has received about 5 spam calls and emails per day. Many of these spam calls concern loans or other financial products he neither applied for nor inquired about.

478. Due to Defendant's Data Breach, Plaintiff Williams will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Williams' Sensitive

Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

479. Plaintiff Williams' highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

480. Knowing that thieves intentionally targeted and accessed his Sensitive Information, has caused Plaintiff Williams great anxiety beyond mere worry.

481. The Data Breach has caused Plaintiff Williams to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

482. Plaintiff Williams has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

483. As a direct and traceable result of the Data Breach, Plaintiff Williams suffered actual injury and damages after his Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant did not adequately protect his Sensitive Information; (iv) emotional distress because identity thieves now possess his first and last name paired with his medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of his Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Williams and/or his medical providers; and (vii) other economic and non-economic harm.

484.    Plaintiff Williams has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

485.    Plaintiff Williams has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Williams' Sensitive Information will be wholly unprotected and at-risk of future data breaches.

### *Plaintiff Melissa Janeiro*

486.    Plaintiff Janeiro is a patient/member of a medical organization that utilizes Defendant's services and was required to provide her Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

487.    Plaintiff Janeiro received a notice letter from Defendant dated March 17, 2026, stating that her Sensitive Information was impacted by the Data Breach.

488.    Plaintiff Janeiro entrusted her Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep her Sensitive Information secure from unauthorized access.

489.    By soliciting and accepting Plaintiff Janeiro's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

490.    Upon information and belief, Defendant was in possession of Plaintiff Janeiro's Sensitive Information before, during, and after the Data Breach.

491.    Following the Data Breach, upon information and belief, Plaintiff Janeiro made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to

researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, and reviewing her credit reports. Upon information and belief, Plaintiff Janeiro estimates she has already spent hours responding to the Data Breach.

492.    Plaintiff Janeiro will be forced to spend additional time reviewing her credit reports and monitoring her accounts for the rest of her life. This is time spent which has been lost forever and cannot be recaptured.

493.    Plaintiff Janeiro places significant value in the security of her Sensitive Information and does not readily disclose it. Plaintiff Janeiro entrusted Defendant with her Sensitive Information with the understanding that Defendant would keep her information secure and would employ reasonable and adequate data security measures to ensure that her Sensitive Information would not be compromised.

494.    Because of the Data Breach, there is no doubt Plaintiff Janeiro's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Janeiro and the Class are at an imminent risk of identity theft and fraud.

495.    Plaintiff Janeiro has noticed a marked increase in spam texts and phone calls since the date of the Data Breach.

496.    Since the date of the Data Breach, Plaintiff Janeiro has received around 2-3 spam calls per day, with one repeatedly regarding a business loan that she neither applied for nor inquired about.

497.    Recently, Plaintiff Janeiro has also begun receiving spam texts concerning offers to purchase or learn more about GLP-1 drugs.

498.    Due to Defendant's Breach, Plaintiff Janeiro will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, her information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Janeiro's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

499.    Plaintiff Janeiro's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

500.    Knowing that thieves intentionally targeted and accessed her Sensitive Information, has caused Plaintiff Janeiro great anxiety beyond mere worry.

501.    The Data Breach has caused Plaintiff Janeiro to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying her of the fact that her Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

502.    Plaintiff Janeiro has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

503.    As a direct and traceable result of the Data Breach, Plaintiff Janeiro suffered actual injury and damages after her Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (ii) loss of privacy due to her Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of her bargain because Defendant did not adequately protect her Sensitive Information; (iv) emotional distress because identity thieves now possess her first and last name paired with her medical information and other sensitive

91

information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of her Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Janeiro and/or her medical providers; and (vii) other economic and non-economic harm.

504. Plaintiff Janeiro has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

505. Plaintiff Janeiro has a continuing interest in ensuring that her Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Janeiro's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

### *Plaintiff Mason Maldonado*

506. Plaintiff Maldonado is a patient/member of a medical organization that utilizes Defendant's services and was required to provide his Sensitive Information, directly or indirectly, to Defendant as part of Defendant's business practices.

507. Plaintiff Maldonado received a notice letter from Defendant dated March 17, 2026, stating that his Sensitive Information was impacted by the Data Breach.

508. Plaintiff Maldonado entrusted his Sensitive Information to Defendant with the reasonable expectation and mutual understanding that Defendant would keep his Sensitive Information secure from unauthorized access.

509.    By soliciting and accepting Plaintiff Maldonado's Sensitive Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

510.    Upon information and belief, Defendant was in possession of Plaintiff Maldonado's Sensitive Information before, during, and after the Data Breach.

511.    Following the Data Breach, upon information and belief, Plaintiff Maldonado made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing his credit reports. Upon information and belief, Plaintiff estimates he has already spent hours responding to the Data Breach.

512.    Plaintiff Maldonado will be forced to spend additional time reviewing his credit reports and monitoring his accounts for the rest of his life. This is time spent which has been lost forever and cannot be recaptured.

513.    Plaintiff Maldonado places significant value in the security of his Sensitive Information and does not readily disclose it. Plaintiff Maldonado entrusted Defendant with his Sensitive Information with the understanding that Defendant would keep his information secure and would employ reasonable and adequate data security measures to ensure that his Sensitive Information would not be compromised.

514.    Because of the Data Breach, there is no doubt Plaintiff Maldonado's highly confidential Sensitive Information is in the hands of cybercriminals. Reason being, the modus operandi of cybercriminals is to steal data they can exploit by selling on the dark web. As such, Plaintiff Maldonado and the Class are at an imminent risk of identity theft and fraud.

515.    Plaintiff Maldonado has noticed a marked increase in spam texts and phone calls since the date of the Data Breach.

516.    Due to Defendant's Breach, Plaintiff Maldonado will be forced to spend money to cover the cost of future credit monitoring and identity-theft monitoring, given the type of data stolen in the Breach and the fact that, upon information and belief, his information has already been published on the dark web. The need for future monitoring is reasonable and necessary and is a consequence of Defendant's breach of duty to maintain Plaintiff Maldonado's Sensitive Information, including medical and health insurance information, secure and protected against unauthorized disclosure.

517.    Plaintiff Maldonado's highly confidential Sensitive Information accessed in the Breach provides hackers with a clear ability to commit fraud.

518.    Knowing that thieves intentionally targeted and accessed his Sensitive Information, has caused Plaintiff Maldonado great anxiety beyond mere worry.

519.    The Data Breach has caused Plaintiff Maldonado to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in notifying him of the fact that his Sensitive Information was accessed and/or acquired by criminals as a result of the Data Breach.

520.    Plaintiff Maldonado has never knowingly transmitted unencrypted Sensitive Information over the internet or any other unsecured source.

521.    As a direct and traceable result of the Data Breach, Plaintiff Maldonado suffered actual injury and damages after his Sensitive Information was compromised and stolen in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (ii) loss of privacy due to his Sensitive Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of his bargain because Defendant

94

did not adequately protect his Sensitive Information; (iv) emotional distress because identity thieves now possess his first and last name paired with his medical information and other sensitive information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Sensitive Information has been stolen and published on the dark web; (vi) diminution in the value of his Sensitive Information, a form of intangible property that Defendant obtained from Plaintiff Maldonado and/or his medical providers; and (vii) other economic and non-economic harm.

522.    Plaintiff Maldonado has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. This risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Sensitive Information stolen in the Data Breach.

523.    Plaintiff Maldonado has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Maldonado's Sensitive Information will be wholly unprotected and at-risk of future data breaches.

**J.    Plaintiffs' and Class Members' Damages.**

524.    Upon information and belief, Plaintiffs' and Class Members' Sensitive Information was stolen in the Data Breach and is now in the hands of cybercriminals who accessed the data Defendant held within its systems.

525.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft. This is particularly true in this case where Plaintiffs' and Class Members' Private Information was stolen, has been misused in multiple instances, and posted for sale to the dark web as a result of the Data Breach.

526. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members will be forced to expend time and money dealing with the effects of the Data Breach, valuable time and resources Plaintiffs and Class Members otherwise would have spent on other activities, including but not limited to work, investments, and/or recreation.

527. Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

528. Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Sensitive Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

529. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

530. Plaintiffs and Class Members also suffered a loss of value of their Sensitive Information when it was likely acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

531. Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiffs and Class Members who received care through Defendant's partner platforms overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards.

532. Part of the price Plaintiffs and Class Members paid was intended to be used by Defendant to fund adequate data security practices to safeguard Plaintiffs' and Class Members'

Sensitive Information. As demonstrated by the Data Breach, Defendant failed to fund and provide adequate data security practices. Thus, Plaintiffs and the Class Members did not get what they paid for and agreed to.

533.    Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably spent to remedy or mitigate the effects of the Data Breach relating to:

a) Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b) Purchasing credit monitoring and identity theft prevention;

c) Placing "freezes" and "alerts" with reporting agencies;

d) Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e) Contacting financial institutions and closing or modifying financial accounts; and,

f) Closely reviewing and monitoring their medical insurance accounts, bank accounts, and credit reports, as well as alerts for identity fraud including their SSNs, for unauthorized activity for years to come.

534.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Sensitive Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but

not limited to, making sure that the storage of data or documents containing Sensitive Information is not accessible online or otherwise to unauthorized third parties.

535.   Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Sensitive Information—which contains the most intimate details about a person's life, including what ailments they suffer, what medications they take, and their body measurements—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

536.   As a direct and proximate result of Defendant's actions and omissions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

### The Data Breach Increases Victims' Risk of Identity Theft

537.   The unencrypted Sensitive Information of Plaintiffs and Class Members has already been posted for sale on the dark web as a result of the Data Breach, as that is the *modus operandi* of hackers.

538.   Unencrypted Sensitive Information may also fall into the hands of companies that will use the detailed Sensitive Information for targeted marketing without the approval of Plaintiffs and Class Members. Simply put, unauthorized individuals can easily access the Sensitive Information of Plaintiffs and Class Members.

539.   The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Sensitive Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

540.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[36] For example, with the Sensitive Information stolen in the Data Breach, identity thieves can open financial accounts, apply for credit, collect government benefits, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[37] These criminal activities have resulted and will result in devastating financial and personal losses to Plaintiffs and Class Members.

541.    Sensitive Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.[38]

542.    Plaintiffs' and Class Members' Sensitive Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

543.    Cyberattacks and data breaches at healthcare companies like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

---

[36] *Facts & Statistics: Identity Theft and Cybercrime*, INSURANCE INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity") (last visited Jan. 25, 2026).

[37] John Egan, *What Should I Do if My Driver's License Number Is Stolen?*, EXPERIAN (June 13, 2024), https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.

[38] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (July 5, 2007), https://www.gao.gov/products/gao-07-737.

544.    Researchers have found that among medical services providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[39]

545.    Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[40]

546.    The United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[41]

547.    That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it.

548.    They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names..

549.    Theft of PHI, in particular, is gravely serious. A thief may use customers' and patients' name or health insurance numbers "to see a doctor, get prescription drugs, buy medical

---

[39] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomeware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.

[40] *See* Sung J. Choi *et al.*, *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Res. 971, 971-80 (2019), https://www.onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.

[41] *See* GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, at 2 (2007), https://www.gao.gov/new.items/d07737.pdf. *See also* United States Government Accountability Office, GAO-19-230, Data Breaches: Range of Consumer Risks Highlights Limitations of Identity Theft Services at 6 (March 2019), https://www.gao.gov/assets/gao-19-230.pdf.

devices, submit claims with [an] insurance provider, or get other medical care. If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[42]

550.    There may additionally be a substantial time lag—measured in years—between when harm occurs and when it is discovered, and also between when Sensitive Information and/or financial information is stolen and when it is used.

551.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

552.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches can be the starting point for these additional targeted attacks on the victims.

553.    Another such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[43]

---

[42] *What to Know About Medical Identity Theft*, https://www.ftc.gov/articles/what-know-about-medical-identity-theft.

[43] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning

554.   With "Fullz" packages, cyber-criminals can cross-reference two sources of Sensitive Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

555.   The development of "Fullz" packages means here that the stolen Sensitive Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Sensitive Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

556.   The existence and prevalence of "Fullz" packages means that the Sensitive Information stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiffs and the other Class Members.

557.   Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

---

credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/.

558.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

559.    Another example is cybercriminals using the stolen information during a spam call or spam message to pose as a legitimate person or organization and obtain additional information from the victims. Criminals can use PII or other sensitive information (that should only be known to certain and specific entities and individuals) to target victims with frauds and scams. Criminals can present themselves as a person or entity and use the stolen PII to "prove" that they are the entity or person they claim to be. This makes a victim's risk of falling for phishing attempts even greater.

560.    Once PII is stolen, fraudulent use of the information and damage to victims may continue for years.

### *Loss of Time to Mitigate the Risk of Identity Theft and Fraud*

561.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Sensitive Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

562.    Thus, due to the actual and imminent risk of identity theft, Defendant, in its Notice Letter instructs Plaintiffs and Class Members obtain their credit reports and place a fraud alert or security freeze on their credit.

563.     Defendant's extensive suggestion of steps that Plaintiffs and Class Members must take in order to protect themselves from identity theft and/or fraud demonstrates the significant time that Plaintiffs and Class Members must undertake in response to the Data Breach. Plaintiffs' and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiffs and Class Members suffered actual injury and damages in the form of lost time that they spent on mitigation activities in response to the Data Breach and at the direction of Defendant's Notice Letter.

564.     Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, contacting banks to ensure their accounts are secured, and signing up for credit monitoring insurance services. Accordingly, the Data Breach has caused Plaintiffs and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

565.     Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office, which has consistently recognized the serious harms following from data breaches. In its 2007 report on data breaches ("2007 GAO Report"), the GAO noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[44] While that report found that the full extent of identity theft resulting from data breaches was not yet fully known, subsequent government findings have confirmed that data breaches regularly and foreseeably result in real harm to real people.

566.     More than a decade later, the GAO revisited data breach harms in its March 2019 report ("2019 GAO Report") and found that large-scale data breaches had by then put hundreds of

---

[44] *See* GAO-07-737, *supra* note 36.

millions of people at risk of identity theft or other harm.[45] The 2019 GAO Report documented the concrete harms that flow from such breaches, including but not limited to financial losses, emotional distress, and the significant time burdens placed on victims to restore their identities. The 2019 GAO Report further warned that bad actors can use stolen personal information for years after a breach, meaning that the risk of harm to affected individuals is neither speculative nor fleeting.[46]

567.    The scale of identity theft has grown dramatically in the years since the 2007 GAO Report. The FTC's Consumer Sentinel Network received over 1.1 million reports of identity theft in 2022 alone – a figure that reflects a steep upward trend from prior years – and consumers reported losing nearly $8.8 billion to fraud that same year, an increase of more than 30 percent over 2021.[47]

568.    Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[48]

---

[45] *See* GAO-19-230, *supra* note 40, at 2.

[46] *Id.*

[47] *See* Federal Trade Commission, Press Release, *New FTC Data Show Consumers Reported Losing Nearly $8.8 Billion to Scams in 2022* (Feb. 23, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/new-ftc-data-show-consumers-reported-losing-nearly-88-billion-scams-2022; Federal Trade Commission, *Consumer Sentinel Network Data Book 2022* (Feb. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/CSN-Data-Book-2022.pdf (reporting over 1.1 million identity theft reports in 2022).

[48] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

569.    And for those Class Members who experience actual identity theft and fraud, both the 2007 and 2019 GAO Reports confirm that victims will face "substantial costs and time to repair the damage to their good name and credit record" – harms that are neither hypothetical nor speculative, but well-documented and increasingly common.[49]

*Diminution of Value of Sensitive Information*

570.    Sensitive Information is a valuable property right.[50] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Sensitive Information has considerable market value.

571.    Private Sensitive Information can sell for as much as $363 per record according to the Infosec Institute.[51]

572.    An active and robust legitimate marketplace for Sensitive Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[52] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[53]

---

[49] *See* GAO-07-737, *supra* note 40; GAO-19-230, *supra* note 39.

[50] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *1 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[51] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

[52] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, Voices (Nov. 5, 2019) https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[53] The Personal Data Revolution, DataCoup, https://datacoup.com/ (last visited May 7, 2026).

Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[54]

573.    As a result of the Data Breach, Plaintiffs' and Class Members' Sensitive Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Sensitive Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

574.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Sensitive Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

575.    The fraudulent activity resulting from the Data Breach may not come to light for years.

576.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Sensitive Information.

577.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to more than twenty thousand individuals detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

---

[54] https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing (last visited May 5, 2026).

578.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Sensitive Information of Plaintiffs and Class Members.

*Future Costs of Credit and Identity Theft Monitoring is Reasonable and Necessary*

579.    Given the type of targeted attack, the sophisticated criminal activity, and the type of Sensitive Information involved in this case, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Sensitive Information for identity theft crimes –e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

580.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Sensitive Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

581.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

582.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

*Loss of Benefit of the Bargain*

583.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

584. When agreeing to pay for medical services and ultimately provide Defendant with their Sensitive Information under certain terms, Plaintiffs and the Class Members understood and expected that Defendant would use a portion of their payment to properly safeguard and protect their Sensitive Information, when in fact, Defendant did not provide the expected data security.

585. Accordingly, Plaintiffs' and Class Members' obtained services were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

## CLASS ACTION ALLEGATIONS

586. Plaintiffs bring this action on behalf of themselves and all others similarly situated for the Class defined below.

587. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose Sensitive Information was compromised by the Data Breach (the "Class").

588. The following people are excluded from the Class: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant has a controlling interest, and their current or former officers and directors; (iii) Plaintiffs' counsel and Defendant's counsel; and (iv) the legal representatives, successors, and assigns of any such excluded persons.

589. Plaintiffs Glodek and Morehart also seek to represent the following Pennsylvania subclass:

> All individuals domiciled in Pennsylvania whose Sensitive Information was accessed by and disclosed to unauthorized persons in the Data Breach (the "Pennsylvania Subclass").

590. **Numerosity:** The exact number of members of the Class is unknown but, upon information and belief, it is estimated to number in the hundreds of thousands or more at this time,

109

given the threat actor's claim to possess over 1.6 million records of Defendant's partners' customers, and individual joinder in this case is impracticable. Members of the Class can be easily identified through Defendant's records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other data breach, consumer, breach of contract, unlawful trade practices, and class action controversies.

591.    **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs, and the members of the Class, sustained damages arising out of Defendant's Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiffs and members of the Class sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

592.    **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiffs have no interests that conflict with, or are antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs.

593.    **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

    a.  Whether Defendant violated the laws asserted herein, including statutory privacy laws;

    b.  Whether Defendant had a duty to use reasonable care to safeguard Plaintiffs' and Class Members' Sensitive Information;

    c.  Whether Defendant breached the duty to use reasonable care to safeguard Plaintiffs' and Class Members' Sensitive Information;

d.  Whether Defendant breached its contractual promises to safeguard Plaintiffs' and Class Members' Sensitive Information;

e.  Whether Defendant knew or should have known about the inadequacies of its data security policies and system and the dangers associated with storing Sensitive Information;

f.  Whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiffs' and Class Members' Sensitive Information from unauthorized release and disclosure;

g.  Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer systems to safeguard and protect Plaintiffs' and Class Members' Sensitive Information from unauthorized release and disclosure;

h.  Whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

i.  Whether Defendant's method of informing Plaintiffs and other members of the Class was unreasonable;

j.  Whether Defendant's conduct was likely to deceive the public;

k.  Whether Defendant is liable for negligence or gross negligence;

l.  Whether Defendant's conduct, practices, statements, and representations about the Data Breach of the Sensitive Information violated applicable state laws;

m.  Whether Plaintiffs and Class Members were injured as a proximate cause or result of the Data Breach;

n.  Whether Plaintiffs and members of the Class were damaged as a proximate cause of the Data Breach;

o.  Whether Defendant's practices and representations related to the Data Breach breached implied contracts with Plaintiffs and members of the Class;

p.  What the proper measure of damages is; and

q.  Whether Plaintiffs and members of the Class are entitled to restitution, injunctive, declaratory, or other relief.

594.  **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual

members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

595.    A class action is superior to individual litigation because:

a.    The amount of damages available to an individual plaintiff is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedural device;

b.    Individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system; and

c.    The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

596.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Information;

b.    Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

c.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

d.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer Sensitive Information; and

e.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

597.  Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### NEGLIGENCE
### *(On Behalf of Plaintiffs & the Class)*

598.  Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

599.  Defendant received the Sensitive Information of Plaintiffs and Class Members, through its partner platforms, including MEDVi, in order to provide telehealth clinical services.

600.  By collecting and storing this data in its computer systems and networks, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard its computer system—and Plaintiff's and Class Members' Sensitive Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

601.  Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure

that its systems and networks, the personnel responsible for them, and its information technology partners adequately protected the Sensitive Information.

602.    Plaintiffs and the Class are a well-defined, foreseeable, and probable group of individuals that Defendant was aware, or should have been aware, could be injured by inadequate data security measures.

603.    A large repository of highly valuable healthcare and personal information is a foreseeable target for cybercriminals looking to steal and profit from that sensitive information. Defendant knew or should have known that, given its repository of a host of Sensitive Information for over 1.6 million individuals, it posed a significant risk of being targeted for a data breach. Thus, Defendant had a duty to reasonably safeguard Plaintiffs' and Class Members' data by implementing reasonable data security measures to protect against data breaches.

604.    Defendant's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Defendant and the individuals whose data it collected and maintained, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach. Plaintiffs and Class Members relied on Defendant to exercise its professional judgment in deciding how to protect the Sensitive Information in its care.

605.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to

protect the privacy of protected health information."[55] Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

606.   In addition, Defendant has a duty to employ reasonable security measures under Section 5 of the FTCA, which prohibits "unfair…practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.[56]

607.   Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Sensitive Information.

608.   But for Defendant's wrongful and negligent breach of its duties to Plaintiffs and Class Members, their Sensitive Information would not have been compromised, stolen, and viewed by unauthorized persons. Defendant's negligence was a direct and legal cause of the theft of the Sensitive Information of Plaintiffs and Class Members and all resulting damages.

609.   As a result of this misconduct by Defendant, the Sensitive Information of Plaintiffs and Class Members was compromised, placing them at a greater risk of identity theft and of their Sensitive Information being disclosed to third parties without the consent of Plaintiffs and the Class.

610.   Further, as a result of this misconduct by Defendant, the Sensitive Information of Plaintiffs and Class Members was compromised, causing loss of privacy, loss of time in dealing with the ramifications of the Data Breach, and diminution in the value of their Sensitive Information.

---

[55] 45 C.F.R. §164.530(c)(1).
[56] *See* 15 U.S.C. §45.

611. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

612. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiffs and all Class Members.

## SECOND CAUSE OF ACTION

### BREACH OF IMPLIED CONTRACT
*(On Behalf of Plaintiffs & the Class)*

613. Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

614. Defendant required Plaintiffs and Class Members to provide and entrust their Sensitive Information as a condition of obtaining telehealth services facilitated by Defendant.

615. Plaintiffs and Class Members paid money, directly and/or indirectly through Defendant's partner platforms such as MEDVi, in exchange for goods and services, as well as Defendant's promise to protect their Sensitive Information from unauthorized disclosure.

616. Defendant promised to comply with legal and industry standards, including HIPAA, and to make sure that Plaintiffs' and Class Members' Sensitive Information would remain protected.

617. Implicit in the agreement between Defendant and Plaintiffs and Class Members was the obligation that both parties would maintain the Sensitive Information confidentially and securely.

618. Defendant breached the implied contracts with Plaintiffs and Class Members by failing to safeguard and protect Plaintiffs' and Class Members' Sensitive Information and by

116

violating industry standards as well as legal obligations that are necessarily incorporated into implied contracts between Plaintiffs, Class Members, and Defendant.

619.     As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and Class Members have suffered (and will continue to suffer) (a) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (b) actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (c) loss of the confidentiality of the stolen confidential data; (d) the possibility of an illegal sale of the compromised data on the dark web; (e) lost work time; and (f) other economic and non-economic harm.

620.     As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and Class Members are entitled to recover actual, consequential, and nominal damages.

### THIRD CAUSE OF ACTION

### UNJUST ENRICHMENT
### *(On Behalf of Plaintiffs & the Class)*

621.     Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

622.     This claim is pleaded solely in the alternative to Plaintiffs' breach of implied contract claim.

623.     Plaintiffs and Class Members conferred a monetary benefit on Defendant by paying money for healthcare services, directly and/or through Defendant's partner platforms, a portion of which was intended to have been used by Defendant for data security measures to secure Plaintiffs' and Class Members' Sensitive Information.

624.    Plaintiffs and Class Members also conferred a benefit on Defendant by sharing their Sensitive Information in exchange for the provision of services and the adequate safeguarding of their Sensitive Information.

625.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Sensitive Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members.

626.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

627.    Plaintiffs and Class Members have no adequate remedy at law.

628.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the Data Breach alleged herein.

## FOURTH CAUSE OF ACTION

**VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq.***
*(On Behalf of Plaintiffs Glodek, Morehart, & the Pennsylvania Subclass)*

629.    Plaintiffs Glodek and Morehart ("Plaintiffs" for purposes of this Count) repeats and realleges the preceding factual allegations, as if fully set forth herein.

630.    Plaintiffs bring this Count on behalf of themselves and the Pennsylvania Subclass.

631.    Defendant is a "person" as defined by 73 Pa. Cons. Stat. § 201-2(2).

118

632. Plaintiffs and Pennsylvania Subclass Members purchased goods and services in "trade" and "commerce" as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes, directly or indirectly.

633. Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of their trade and commerce in violation of 73 Pa. Cons. Stat. Ann. § 201-3, including the following:

    a) Representing that its goods and services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have (73 Pa. Stat. Ann. § 201-2(4)(v));

    b) Representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Stat. Ann. § 201-2(4)(vii)); and

    c) Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. Ann. § 201-2(4)(ix)).

634. Defendant's unfair or deceptive acts and practices include:

    a) Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Pennsylvania Subclass Members' Sensitive Information, which was a direct and proximate cause of the Data Breach;

    b) Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures after previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c) Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Pennsylvania Subclass Members'

Sensitive Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

d) Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and Pennsylvania Subclass Members' Sensitive Information, including by implementing and maintaining reasonable security measures;

e) Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Pennsylvania Subclass Members' Sensitive Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f) Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Pennsylvania Subclass Members' Sensitive Information; and

g) Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Pennsylvania Subclass Members' Sensitive Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

635. Defendant's representations and omissions were material because they were likely to deceive Plaintiffs and Pennsylvania Subclass Members about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Sensitive Information.

636. Defendant intended to mislead Plaintiffs and Pennsylvania Subclass Members and induce them to rely on its misrepresentations and omissions.

637. Had Defendant disclosed to Plaintiffs and Pennsylvania Subclass Members that its data systems were not secure and thus were vulnerable to attack, Defendant could not have

continued in business and would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendant received, maintained, and compiled Plaintiffs' and Pennsylvania Subclass Members' Sensitive Information as part of the services Defendant provided and for which Plaintiffs and Pennsylvania Subclass members paid without advising Plaintiffs and Pennsylvania Subclass Members that Defendant's data security practices were insufficient to maintain the safety and confidentiality of Plaintiffs' and Pennsylvania Subclass Members' Sensitive Information. Accordingly, Plaintiffs and the Pennsylvania Subclass Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

638. Defendant acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law and recklessly disregarded Plaintiffs' and Pennsylvania Subclass Members' rights. Defendant (1) represented in its information privacy and confidentiality policies that it was implementing reasonable security measures to protect Plaintiffs' and Pennsylvania Subclass Members' sensitive personal information and (2) failed to implement reasonable data security measures despite being on notice that its data security and privacy protections were inadequate.

639. As a direct and proximate result of Defendant's unfair methods of competition and unfair or deceptive acts or practices and Plaintiffs' and Pennsylvania Subclass Members' reliance on them, Plaintiffs and Pennsylvania Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendant, since they would not have paid Defendant for goods and services or would have paid less for such goods and services but for Defendant's violations alleged herein; losses from fraud and identity theft; costs for credit

monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Sensitive Information; and an increased, imminent risk of fraud and identity theft, and other targeted misuse of their information (including racially, religiously, or politically motivated misuse).

640. Plaintiffs and Pennsylvania Subclass Members seek all monetary and nonmonetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, restitution, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

## FIFTH CAUSE OF ACTION

### DECLARATORY JUDGMENT
### *(On Behalf of Plaintiffs & the Class)*

641. Plaintiffs re-allege and incorporate by reference all preceding factual allegations, as if fully set forth herein.

642. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

643. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' Sensitive Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their Sensitive Information.

644. Plaintiffs allege that Defendant's data security measures remain inadequate.

645.    Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Sensitive Information and remain at imminent risk that further compromises of their Sensitive Information will occur in the future.

646.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

647.    Defendant owes a legal duty to secure the Sensitive Information of its current and/or former students, applicants, and employees and to timely notify impacted individuals of a data breach under common law and various state and federal statutes; and

648.    Defendant continues to breach this legal duty by failing to employ reasonable measures to secure the Sensitive Information in its possession.

649.    This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate data security protocols consistent with law and industry standards to protect Sensitive Information in Defendant's data network.

650.    If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and she will be forced to bring multiple lawsuits to rectify the same conduct.

651.    The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

652.   Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiffs and current and/or former students and applicants and employees whose confidential information would be further compromised.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all persons similarly situated, prays for judgment in their favor and against Defendant Openloop Health, Inc. and respectfully requests that this Honorable Court enter an order:

A.   Certifying this action as a Class action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.   Granting equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Sensitive Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.   Granting equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Sensitive Information compromised during the Data Breach;

D.   Granting equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.   Requiring Defendant to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

F.      Awarding actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.      Awarding punitive damages, as allowable by law;

H.      Awarding attorneys' fees and costs under the common fund doctrine, and any other applicable law;

I.      Awarding costs and any other expense, including expert witness fees, incurred by Plaintiffs in connection with this action;

J.      Awarding pre- and post-judgment interest on any amounts awarded; and

K.      All such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: May 7, 2026

Respectfully submitted,

*/s/ J. Barton Goplerud*
J. Barton Goplerud, AT0002983
Brian O. Marty, AT0011622
**SHINDLER ANDERSON GOPLERUD & WEESE P.C.**
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265-5749
Telephone: (515) 223-4567
Facsimile: (515) 223-8887
goplerud@sagwlaw.com
marty@sagwlaw.com

William B. Federman*
Jessica A. Wilkes*
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, Oklahoma 73120
Telephone: (405) 235-1560
E: wbf@federmanlaw.com
E: jaw@federmanlaw.com

125

Nicholas J. Mauro
**Carney & Appleby Law Firm**
303 Locust St., #400
Des Moines, IA 50309
515-282-6803
mauro@carneyappleby.com

Britany A. Wessan*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Ave.
Chicago, Illinois 60614
(708) 437-6476
britany@almeidalawgroup.com

John J. Nelson**
**MILBERG, PLLC**
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Telephone: (858) 209-6941
jnelson@milberg.com

Tyler J. Bean*
Tanner R. Hilton**
**SIRI & GLIMSTAD LLP**
101 Park Avenue
Suite 1300, #16982799
Oklahoma City, OK 73102
Tel: (212) 532-1091
E: tbean@sirillp.com
E: thilton@sirillp.com

Philip J. Krzeski*
**CHESTNUT CAMBRONNE PA**
100 Washington Ave. S., STE 1700
Minneapolis, MN 55401
T: (612) 339-7300
E: pkrzeski@chestnutcambronne.com

Jeff Ostrow**
**KOPELOWITZ OSTROW P.A.**
One West Law Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 332-4200
ostrow@kolawyers.com

\* *Pro hac vice*

\*\* *Pro hac vice* to be filed

*Counsel for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 7, 2026, a copy of the foregoing was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's CM/ECF system, which will automatically notify all counsel of record.

/s/ J. Barton Goplerud
J. Barton Goplerud